Bernard D. PACHTER, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. and Thomas Tatigikis, Defendants.

No. 74 C 1050.

United States District Court,
E. D. New York.

Jan. 6, 1978.

Beekman & Bogue, New York City by Martin P. Unger, Carlton R. Asher, Jr., New York City, for plaintiff.

Thomas J. Hanrahan, New York City, for defendants.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

This is an action by a purchaser of stock in Equity Funding Corporation of America ("Equity Funding") against his brokerage firm, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), and Thomas Tatigikis, the account executive assigned to service his account. Plaintiff seeks to rescind the agency contract under which Merrill Lynch was to purchase 2,000 shares of Equity Funding common stock, or, alternatively, to recover damages. The asserted grounds of liability are § 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 204.10b–5, and pendent claims of common law fraud, breach of fiduciary duty, negligence and conversion.[1] Merrill Lynch has counterclaimed for money due and owing.[2] The case was tried to the court and the following constitutes the court's findings of fact and conclusions of law. Rule 52(a), F.R. Civ.P.

### Background Facts

The focus of this lawsuit is on events which occurred on March 27, 1973, the day the New York Stock Exchange (NYSE) suspended trading in the common stock of Equity Funding because of rumors and questions concerning practices subsequently well-documented as fraudulent.[3]

Plaintiff, who was self-employed as a consultant on business opportunities in the clinical laboratory field, had maintained both cash and margin accounts with the Melville, New York branch office of Merrill Lynch in March and April 1973. He may be described as a speculator in stock, as that term is commonly known, well-versed in the vagaries of the market. He frequently visited his broker, Tatigikis, whose office was conveniently located in the same office building as his own, often read Tatigikis' copy of The Wall Street Journal, followed trading on the tape and discussed the market and particular stocks. Some investments were made on his broker's recommendation; many others, including those of March 27, were unsolicited and based upon his own judgment.

On Tuesday, March 27, 1973, plaintiff was watching the tape in Tatigikis' office shortly after trading opened on the NYSE, when he observed an "uptick" on the Equity Funding stock, the first he had seen after watching the stock for some time. He immediately placed an order with Tatigikis to purchase 2,000 common shares at market price on his margin account. Plaintiff testified he bought the stock as "a purely emotional reaction," looking for a technical advance. He knew the price of the stock had dropped from the mid-forties to 17 and, when he purchased, hoped it would go to 19 or 20 at which time he intended to sell. About 10:30 a. m. Merrill Lynch executed the order on the NYSE, purchasing the stock at $17½ per share for a total price of $35,382 including commission, and settlement was set, as was customary, for April 3, 1973, one week later.

That morning an article had appeared in The Wall Street Journal, set forth in full in the margin, captioned "Equity Funding Stock Falls Amid Rumors about a Unit," which related the existence of rumors about the operations of a life insurance subsidiary accompanying recent heavy selling of the

1. The complaint also contained a claim that the contract between plaintiff and Merrill Lynch was void under Section 29 of the Act, 15 U.S.C. § 78cc, but that claim was not pressed at trial and is deemed abandoned.

2. The counterclaim and reply were originally the complaint and answer, respectively, of an action instituted by Merrill Lynch in New York State Supreme Court on June 26, 1973, seeking recovery of the payment it was required to make for the Equity Funding Stock and a loss it sustained on liquidating the Oakhill stock. They were added to this lawsuit upon stipulation.

3. The Equity Funding scandal, one of the largest ever, centered around the creation and subsequent resale to reinsurers of bogus life insurance policies. Many millions of dollars of worthless assets made Equity Funding appear to be a successful concern. The fraud continued up to the end, as insiders sold their stock immediately prior to the suspension of trading.

stock.[4] Plaintiff testified he had not read the article. It was not mentioned by Tatigikis, who testified he could not recall whether he had read the article prior to plaintiff's purchase.

Plaintiff paid a second visit to Tatigikis about 11:00 a. m. that morning and placed an order, also unsolicited, for the purchase of 2,000 shares of Oakhill Sportswear common stock on the over-the-counter market for his cash account. This order was executed at a price ranging from $7¾ to $8 per share for a total of $16,038.98 including commissions, and was also to settle on April 3, 1973.

Plaintiff came to seek Tatigikis a third time, at about noon. Tatigikis told him the Equity Funding stock was "dropping like a bomb," that plaintiff had "taken beatings before and the stock [did] not look too well, this [was] strictly tape action" and suggested plaintiff sell. Plaintiff responded that he was not worried about the tape action and would hold on.[5]

At 12:45 p. m. the NYSE suspended trading in Equity Funding common stock. The following day, March 28, the SEC suspended trading in all Equity Funding securities. The suspension lasted through October 17, 1976.

That same day or the next, it is unclear, plaintiff sought the advice of his attorney as to what he should do and was told to request his broker to supply him with the names of the selling brokers or sellers "and we will proceed from there." Pachter asked Tatigikis for the names, stating his attorney's desire for the information in order "to find out whether we bought insider stock." Considering the request unusual, Tatigikis relayed it to the branch manager, Cappiello, who subsequently referred it to Merrill Lynch's legal department. Although no one at Merrill Lynch refused to supply the information, the names were apparently not provided to plaintiff until the lawsuit ensued between the parties referred to in n. 2, *supra.*

On Monday, April 2, plaintiff again questioned Tatigikis about the requested information and told him that, because of the delay, he had decided there must be something phony about the stock, that he did not want it, and did not want Merrill Lynch to take delivery or to act on his behalf anymore. Tatigikis and Cappiello then met with plaintiff, who reiterated his position. Cappiello told plaintiff he was instructed by the Merrill Lynch legal department that the suspension of trading did not change the terms of the transaction, nor was payment contingent on supplying the information requested and the transaction had to go through.

Plaintiff testified that on April 3 he delivered a letter to Cappiello confirming his

"oral instructions given to Mr. Tatigikis on Monday, April 3, 1973, instructing him to refuse to accept delivery of 2,000 shares of Equity Funding Corp., the order for which was placed by me on March 27, 1973." PX 16.

4. The article, PX 6, read:

"EQUITY FUNDING STOCK FALLS AMID RUMORS ABOUT A UNIT

"LOS ANGELES—Recent heavy selling of the stock of Equity Funding Corp. of America has been accompanied by rumors that questions have been raised about the operations of Equity Funding Life Insurance Co., a subsidiary chartered in Illinois and headquartered here.

"Equity Funding common slid $2.25 yesterday to close at $17, as the New York Stock Exchange's most active stock on a turnover of 768,400 shares. The stock has closed as high as $37.25 earlier this year.

"The questions center on the accuracy of the subsidiary's reported statements of new policies written and total insurance in force.

In a statement yesterday, Stanley Goldblum, chairman and president of Equity Funding, declined to give the nature of the rumors but acknowledged that they were circulating in the financial community. He said they were without foundation and that the company was 'taking steps' to prevent their further spread.

"Examiners from the Illinois and California departments of insurance have been auditing the books of the subsidiary for more than a week, but both departments say that the procedure is a routine triennial audit, for which the company was overdue. Sources in both departments confirmed that they heard the rumors about the alleged irregularities."

5. Deposition of Tatigikis at 22–23; Trial Tr. at 46–48 (Pachter), 183–89 (Tatigikis).

The letter was dated April 4, 1973 and Cappiello testified he received it that day. The letter also dealt with plaintiff's delivery demands for the Oakhill Sportswear stock. Plaintiff did not pay for any of the stock on settlement day. On April 3 Merrill Lynch accepted delivery of the 2,000 shares of Equity Funding and the 2,000 shares of Oakhill Sportswear purchased for plaintiff's account.

With respect to the Oakhill stock, plaintiff took the position that if he paid the amount due without concurrently taking delivery, Merrill Lynch would liquidate the Oakhill shares and apply the proceeds to the Equity Funding debit balance on his margin account. He advised Merrill Lynch he would pay only upon delivery of the Oakhill certificates, which he would accept in street name. Although Merrill Lynch had sufficient Oakhill shares in street name available, it refused plaintiff's offer and after notice, subsequently liquidated the Oakhill stock at a $1,503.82 loss.

Finally, in the course of the reorganization of Equity Funding, which had filed pursuant to Chapter X of the Bankruptcy Act, holders of Equity Funding common stock were denominated "class * creditors" and were required to file notice of claim with the Trustee by February 10, 1976. No notice of claim was filed by plaintiff or Merrill Lynch with respect to the stock in question. Merrill Lynch claims it mailed plaintiff such a notice, although in the interim plaintiff had moved and the notice was sent, if at all, to plaintiff's old address. Notices were also published in The Wall Street Journal. Plaintiff denied receiving any notice and did not recall reading anything in the newspapers about claims stockholders could make in the Equity Funding bankruptcy. He admitted, however, that he had not notified Merrill Lynch in writing of his change of address and had received in Florida forwarded mail communications from Merrill Lynch. If a notice of claim had been filed, a holder of Equity Funding stock having the number of shares plaintiff purchased would have received shares of the common stock of Orion Capital Corporation having a value of approximately $10,-000. Pursuant to the plan of reorganization, all securities of Equity Funding, as such, have been cancelled and have no value.

Plaintiff contends that the contract with Merrill Lynch for the Equity Funding stock should be declared rescinded. Merrill Lynch contends that plaintiff is the holder of the stock and is liable for moneys due and owing. Merrill Lynch also maintains it did not refuse to mitigate damages by not filing a notice of claim. With respect to the Oakhill stock, plaintiff seeks reinstatement of 2,000 shares to his account and delivery of such shares upon his payment of $16,-038.98, while Merrill Lynch seeks recovery of $1,503.82 for the loss incurred upon its liquidation of that stock.

### Discussion

#### Securities Fraud

Plaintiff maintains that his broker, intentionally or with reckless disregard, failed to disclose information about Equity Funding which defendants had a duty to disclose and which would have been significant in plaintiff's decisions to purchase that stock and to determine his legal rights. For purposes of analysis, these claimed omissions fall into two time-frames: those of March 27, 1973 before suspension of trading in Equity Funding and those after suspension.

As to the pre-suspension omissions, the grounds are that on two occasions during the morning of March 27, 1973 defendants failed to disclose to plaintiff (a) the existence or contents of the March 27, 1973 Wall Street Journal article concerning Equity Funding, and (b) the substance of the rumors about Equity Funding then circulating in the investment community. The occasions for disclosure were first, when plaintiff gave the unsolicited order to purchase the stock at about 10:24 a. m., and second, when Tatigikis told plaintiff at about noon of the sharp drop in price and suggested he sell and take his loss because the tape action did not look well.

As plaintiff's sole contact with Merrill Lynch at this time was Tatigikis, any omis-

sions attributable to defendants must refer to his statements and conduct. No suggestion is made that Merrill Lynch itself possessed inside information or had refused to disclose facts to its account executives. Thus plaintiff must establish Tatigikis' knowledge of the facts assertedly not conveyed, based on what he knew at that time.

■ An essential premise of plaintiff's claim is that Tatigikis had a duty to disclose the newspaper article and rumors about Equity Funding. A broker, as agent, does have obligations to a customer to inform him of any facts, unknown to the principal, material to the transaction, see Note, *Conflicting Duties of Brokerage Firms,* 88 Harv.L.Rev. 396, 397 (1974), and, when in a fiduciary relation, to deal fairly with his customers, a duty intended to protect investors who reasonably would rely on his advice, see *Charles Hughes & Co. v. Securities Exchange Commission,* 139 F.2d 434 (2 Cir. 1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944); 3 Loss, Securities Regulations 1490 (2 ed. 1961). The court finds that plaintiff here, however, in placing his order, solicited no advice and clearly made an independent investment decision. The "information" claimed to be omitted was either publicly known, *e. g.,* the Wall Street Journal article, or rumors of the market place. The article was equally available to plaintiff. The rumors, by definition, were not facts. There is no duty to disclose in such circumstances.

■ But even granting that Tatigikis had a duty to notify plaintiff of the rumors and article, a more fundamental defect bars plaintiff's claim of a violation of § 10(b) and Rule 10b–5. There is no credible proof that Tatigikis had knowledge of the specific facts claimed to have been omitted on the morning of March 27, 1973, and, in any event, he lacked the requisite scienter.

As to his knowledge, although Tatigikis testified that it was his habit to read the Wall Street Journal daily and that he did read it sometime on March 27, the testimony was doubtful whether he had read the specific article on Equity Funding that morning. The article itself, n. 4, *supra,* consisted of four small paragraphs on an inside page, had no glaring headline and was not couched in specifics. The court credits his testimony that, if he had read the article before the order, he would have brought it to plaintiff's attention. It is a fair inference that he was unaware and did not think of the article in dealing with plaintiff, and the court so finds.

Moreover, there was no evidence that Tatigikis, a single broker in a Long Island branch office, had knowledge of any of the rumors then said to be circulating in the investment community. Tatigikis had no reason to take notice of Equity Funding. He had no customers who traded in the stock and had never discussed it with plaintiff, nor had Merrill Lynch researched or made a market in Equity Funding. There is not a scintilla of proof that at the time of execution of plaintiff's order, Merrill Lynch had any reason to know that Equity Funding was in trouble or that the stock it acquired for plaintiff was in any way tainted. There can be no failure to disclose without knowledge of the facts claimed to have been omitted.

Plaintiff differentiates the second conversation by contending that Tatigikis undertook to give investment advice when he said the stock was dropping like a bomb, did not look too well, and advised "why don't we get out and take our beating", and thereupon had the responsibility to give plaintiff full disclosure. Aside from the dubiousness of plaintiff's contention that the remark was investment advice to him, this was not a circumstance of partial disclosure under which the statement made was misleading because of material nondisclosures. What Tatigikis said was not any kind of disclosure of information—it was an opinion based on observing the action of the stock on the tape. Nothing in the record indicates that between the initial order and the second conversation Tatigikis had been put on notice of the developments regarding Equity Funding stock.

The language of § 10(b) furthermore precludes imposition of liability. Section 10(b) is violated by the use or employment of

"any manipulative or deceptive device or contrivance." As the Supreme Court has emphasized, liability attaches only for "knowing and intentional" misconduct, where plaintiff pleads and proves " 'scienter'—intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976).

The stock purchase transaction and the entire relationship between plaintiff and Tatigikis is wholly lacking the indicia of an intent to defraud. Even if the scienter required for civil liability is broadened to include not only actual intent to deceive but reckless behavior, see *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 193–94 n. 12, 96 S.Ct. 1375 (question not decided), Tatigikis' conduct does not remotely approach recklessness as defined in this Circuit. In the absence of proof that a defendant had actual knowledge of any omission, proof is nonetheless required "that the defendant's failure to discover the . . . omissions amounted to a willful, deliberate or reckless disregard for the truth that is the equivalent of knowledge." *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1305 (2 Cir. 1973); *Shemtob v. Shearson Hammill & Co.,* 448 F.2d 442, 445 (2 Cir. 1971); *Katz v. Realty Equities Corp.,* 406 F.Supp. 802, 805 (S.D.N.Y.1976). The evidence here is wholly insufficient to permit a finding of such culpability.

Turning to the alleged post-suspension omissions, plaintiff claims that Merrill Lynch failed to provide him with the names of the selling brokers (or sellers themselves) as he had requested up to and including day of settlement, failed to investigate whether the transaction conformed to securities laws and failed to advise him that it had not so investigated. Even if Merrill Lynch did fail to advise plaintiff of the names of the selling brokers, such an omission has none of the earmarks of an act identified with a fraud or deceit, nor has plaintiff so contended. Such conduct may or may not amount to a breach of fiduciary duty or breach of employment contract, points which will be addressed later, but lacks the requisite elements of a § 10(b) and Rule 10b–5 violation.

The neglect to provide the names cannot be fairly viewed as "manipulative or deceptive" so as to come within the ambit of a securities violation. *Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 1299–1301 (1977); *Browning Debenture Holders Comm. v. DASA Corp.,* 560 F.2d 1078, 1084 (2 Cir. 1977).

Moreover, the failure to provide the names of the selling brokers cannot be treated as a material omission of fact. There is no evidence that Merrill Lynch made any representations or conducted any investigation regarding the legality of the sale of the stock. A failure to ascertain information requested cannot be equated to an intentional failure to disclose known information. Plaintiff having failed to prove the elements of a Rule 10b–5 claim, that claim is dismissed on the merits.

*State Law Claims*

As plaintiff's agents, Tatigikis and Merrill Lynch were bound to exercise "the utmost good faith" toward plaintiff. *Elco Shoe Manufacturers v. Sisk,* 260 N.Y. 100, 103, 183 N.E. 191, 192 (1932). Plaintiff claims that Tatigikis violated this fiduciary obligation when he failed to disclose the contents of the Wall Street Journal article on March 27, 1973. This claim must fail, for, as the court has found, Tatigikis either had not read the article before the order was placed or had not remembered it because it lacked significance to him prior to plaintiff's purchase. No fault can be found with Tatigikis' actions at any time during the period in question.

Merrill Lynch, on the other hand, did not discharge its fiduciary duty when it failed to provide plaintiff promptly with the names of the selling brokers from whom it had purchased the Equity Funding shares. Indeed, Merrill Lynch also breached a contractual obligation to furnish the name of the seller "on request." PX 4. Nevertheless, plaintiff is not entitled to relief, for he suffered no injury as a result of Merrill Lynch's initial refusal to furnish the names of the selling brokers. In compliance with a court order in the State court

action brought by Merrill Lynch, *supra* n. 2, plaintiff was provided with the names of the selling brokers on April 30, 1974. At that point plaintiff was free to test his suspicions that he had received insiders' stock. His failure to do so undercuts his contention that the names were of vital importance prior to the settlement date.

■ With respect to the Oakhill stock, plaintiff claims that Merrill Lynch violated its fiduciary duty to him and is guilty of conversion in refusing to deliver the stock when he tendered payment. Under the terms of the contract, however, plaintiff was bound to pay for the securities on the settlement date, and the normal and customary practice was for Merrill Lynch to provide him with the securities soon thereafter. Plaintiff wished to vary the original understanding by withholding payment until he had first received the stock certificates from Merrill Lynch. Plaintiff was not entitled to such a change simply because of fear that Merrill Lynch might apply the payment to the debit created by his refusal to pay for the Equity Funding stock. Merrill Lynch was justified in refusing to accept plaintiff's proposal and in promptly liquidating the Oakhill stock to avoid further loss.

The complaint also contains claims sounding in common law fraud and negligence. The claim of fraud in this case has been well canvassed and is unsupported. The court also finds that defendants did not act negligently in the transactions in question.

### Merrill Lynch Counterclaim

■ Finally, Merrill Lynch seeks judgment on its counterclaim for breach of contract. Despite the suspension order, it was required under NYSE and Stock Clearing Corporation rules to accept delivery and make payment for the Equity Funding stock. Where, as here, Merrill Lynch was acting in good faith, it was entitled to complete its contractual obligations to the selling brokers. See S.E.C. Release No. 34-7920, July 19, 1966, 31 F.R. 10076.

■ Plaintiff defends against the counterclaim with the contention that Merrill Lynch failed to prove that plaintiff's 2,000 shares of Equity Funding had been delivered to it. The parties stipulated that the 2,000 shares were sold to Merrill Lynch by the following brokers: Bear Stearns—300 shares; Goldman Sachs—300 shares; Salomon Brothers—300 shares; S.D. Cohen—100 shares; and CBW/Hayden Stone—1,000 shares. At trial Merrill Lynch introduced into evidence a business record showing the amount of Equity Funding stock delivered to Merrill Lynch on the settlement date, April 3, 1973. DX F. The document, part of a daily list of stock transactions drawn up by the Stock Clearing Corporation, discloses that, of a total of 7,700 shares of Equity Funding stock delivered to Merrill Lynch that day, 2,100 were purchased at the price quoted to plaintiff, 17½. These 2,100 shares were in blocks of 300, 300, 300, 100 and 1,100, from the same five brokers listed above. Trial Tr. at 350. The only variance is in the final total, which may well have included 100 shares for another purchaser. The court finds that Merrill Lynch presented sufficient evidence to prove delivery.

■ Plaintiff's sole remaining defense is that Merrill Lynch failed to mitigate its damages by exchanging the worthless Equity Funding stock for the Orion Capital stock. Merrill Lynch, as merely the agent holding the Equity Funding stock, was not obligated to exchange it for the Orion stock. It satisfied its obligations by mailing the notice of the exchange opportunity to plaintiff. Although plaintiff alleges he never received the notice, the evidence shows that it was mailed to his record address. He admittedly received in Florida statements sent by Merrill Lynch to the Melville address. His change in address was never filed with Merrill Lynch,[6] and

---

6. Tatigikis testified he knew that plaintiff had moved to Florida but denied receiving the new address. When plaintiff was asked whether he gave his new address to Tatigikis, he merely replied, "I think I did." He admitted he did not notify Merrill Lynch in writing of his change in address. Based on this testimony, the court finds that plaintiff failed to satisfy his burden of proving that he did in fact advise Merrill Lynch of his change in address.

under his customer's agreement Merrill Lynch properly used the last address he had designated.

It is undisputed that plaintiff failed to pay for the Equity Funding and Oakhill stock which he ordered on March 27, 1973. As a result, Merrill Lynch lost $35,382 on the Equity Funding stock, which could not be liquidated because of the S.E.C. suspension order and is now worthless, and $1,503.82 on the Oakhill stock, which was sold at a loss.

Accordingly, plaintiff's claims are dismissed and Merrill Lynch is granted judgment on its counterclaim in the amount of $36,885.82 plus interest. Settle form of judgment on notice.

SO ORDERED.