**Robert SCHENCK, Plaintiff,**

v.

**BEAR, STEARNS & CO., Merkin & Co., Inc., et al., Defendants.**

**No. 76 Civ. 5400.**

United States District Court,
S. D. New York.

Nov. 13, 1979.

---

Ernest H. Hammer, New York City, for plaintiff.

M. David Hyman, New York City, for defendant Bear, Stearns & Co.

Reavis & McGrath by David C. Birdoff, Nathaniel L. Gerber, New York City, for defendant Merkin & Co., Inc.

MOTLEY, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

From mid-1972 until the present time, plaintiff Robert Schenck was a citizen of the United States and a resident of Paris, France. Defendant Bear, Stearns & Co. ("Bear, Stearns") is a stock brokerage firm, with its principal place of business in New York, and is a member of the New York Stock Exchange. Defendant Merkin & Co., Inc. ("Merkin") is a stock brokerage firm with its principal place of business in New York.

Plaintiff Schenck is a relatively sophisticated securities investor who from 1967 through 1972 was associated with four stock brokerage firms as a registered representative and/or registered principal. The sequence of events leading to plaintiff's claims began in April, 1972, when plaintiff opened a margin securities account through TPO Inc., a New York brokerage house which ceased operations in 1973 and whose accounts were subsequently carried through defendant Merkin.

In a margin account, the customer borrows money from his broker in order to purchase securities. The customer advances only a portion of the purchase price and pays interest on the amount borrowed to finance the securities purchased. The broker retains possession of the securities purchased as collateral. By trading on margin, a customer is able to purchase a greater number of securities with a given amount of capital than he could purchase with that same amount of capital in a cash account.

Plaintiff moved to Paris shortly after opening his account. He did, however, return to New York several times each year, spending much of his time in New York at the offices of Merkin, following his investments. At Merkin, the registered representative for plaintiff's account was Alvin Corwin. Corwin is presently a vice president and director of the retail bond division of the brokerage firm of A.G. Becker & Co.

Virtually all of plaintiff's transactions at TPO and Merkin were in speculative debentures. Plaintiff's account was nondiscretionary, and no purchases were made without his prior approval or consent.

Commencing in 1972 and until March, 1975, plaintiff purchased debentures issued by GAC Properties Credit, Inc. ("GAC debentures") which bore interest at rates of eleven percent and twelve percent per annum. The interest which plaintiff earned on the debentures was greater than the interest he paid on the margin account loans. The GAC debentures purchased by plaintiff were in denominations of $1,000 each and traded at a percentage of their face value. For example, if the debentures were trading at 76 they would be trading at a price of seventy-six percent of face value or $760 per debenture. The GAC debentures traded at a discount from face value in part because they were considered speculative or risky investments.

Plaintiff was aware of the speculative nature and risk of GAC debentures and was so informed by Corwin. Plaintiff was also aware and was advised by Corwin that because of the speculative nature of these debentures, plaintiff had to follow their progress and market activity very closely.

On or about June 9, 1975, defendant Merkin, which had been clearing its transactions through other brokerage houses, entered into a clearing agreement with defendant Bear, Stearns. A clearing broker, such as Bear, Stearns, maintains all pertinent books and records relating to customers' accounts introduced to it by the introducing broker, such as Merkin. The clearing broker makes loans on the margin accounts to such customers, and is responsible for computing the margin requirements for such margin accounts and for issuing calls to the customers for additional margin.

Margin accounts, such as plaintiff's, are subject to two types of margin requirements. Pursuant to Regulation "T" promulgated by the Board of Governors of the Federal Reserve Board, when a customer initially purchases a security, he is obligated

to have a specific amount of equity in his account; this is an "initial margin" requirement. The second type of margin requirement is a "maintenance margin" requirement, regulating the amount of equity a customer must maintain in his account after he has complied with Regulation "T". Rule 431 of the New York Stock Exchange effectively limits loans to seventy-five percent of the market value of the securities in a margin account. In addition, brokers generally impose margin requirements stricter than those provided in Rule 431.

The clearance agreement between Merkin and Bear, Stearns provides in part as follows:

> In connection with the carrying of customers' accounts of Merkin it is agreed that Merkin will accept the responsibility for the initial deposit of margin whenever an account is opened or reopened or whenever a payment is required by Regulation "T" as amended, promulgated by the Board of Governors of the Federal Reserve Board and the responsibility for payment in full of the case of all cash transactions for individual accounts. After the initial payment as required by Regulation "T" in a margin account further responsibility for maintaining proper margin in the account is solely that of Bear, Stearns. Bear, Stearns may in its sole discretion execute a buy-in or sell-out in a cash or margin account carried for Merkin whenever it deems such action appropriate and regardless of whether the account is then in compliance with the margin maintenance requirements of the New York Stock Exchange, Inc. or has requested an extension of time in which to make payment. Bear, Stearns reserves the right in its sole discretion to decline to make application to the New York Stock Exchange, Inc. for an extension of time for any account of Merkin to make any payment required by Regulation "T".

In connection with plaintiff's account at Merkin, which was cleared through Bear, Stearns, plaintiff executed a Customer's Agreement with Bear, Stearns which provides:

> 2. Any and all property belonging to me or in which I may have an interest held by you or carried in any of my accounts (either individually or jointly with others) shall be subject to a general lien for the discharge of my obligations to you, wherever or however arising and without regard to whether or not you have made advances with respect to such property, and you are hereby authorized to sell and/or purchase any and all property in any of my accounts without notice to satisfy such general lien.
>
> 3(a). Without notice to me, any and all property, in my margin accounts may be carried in your general loans, and may be pledged, repledged, hypothecated or rehypothecated, separately or in common with other property, for the sum due to you thereon or for a greater sum and without retaining in you possession and control for delivery or a like amount of similar property. I will maintain such margins in my margin accounts as you may in your discretion require from time to time and will pay on demand any debit balance owing with respect to any of my margin accounts, and if not paid, you without notice to me may liquidate part of or all of my holdings with you to satisfy said debit balance.
>
> 3(b). You may, in the event of my death or whenever in your discretion you consider it necessary for your protection, sell any or all property held in any of my accounts, cancel any open orders for the purchase or sale of any property with or without notice to me, and you may borrow or buy in any property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine, and no demands, calls, tenders or notices which you may make or give in any one or more instances shall invalidate the aforesaid waiver on my part. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any deficiency in my accounts.

12. This agreement constitutes our complete agreement and is not subject to oral modification and shall be governed by the laws of the State of New York.

On this Customer's Agreement plaintiff listed an address in Paris, France as his mailing address. Plaintiff never advised Bear, Stearns in writing that he was in New York or that mail should be directed to him in New York.

Testimony in this case indicated that according to the practice and custom in the securities industry, a clearing firm may, as a courtesy, notify an introducing firm of the issuance of a margin call to one of its customers. The responsibility to notify the customer, if any, however, rests exclusively with the clearing firm. Testimony also suggests that plaintiff was aware of the fact that his margin account was with Bear, Stearns, which would notify him of the issuance of any margin call.

Plaintiff arrived in New York during the first week of July, 1975, and remained until his departure to Paris on August 14, 1975. During this period plaintiff spent much of his time at Merkin's offices following his investments, including GAC debentures.

Beginning the week of August 4, 1975, the GAC debentures experienced a substantial and sudden decline in market value. By Friday, August 8, 1975, the quoted bid price had dropped from 72, the price on August 1, to 59. Plaintiff was aware of these developments.

On August 8, 1975, the New York Stock Exchange suspended trading in the debentures due to substantial losses sustained by GAC. Trading of the debentures continued thereafter in the over-the-counter market. Plaintiff was aware of these developments.

On August 8, 1975, Corwin, at plaintiff's request, sold 100 of plaintiff's GAC debentures at a price of $590 each plus accrued interest. Plaintiff wanted to sell more of the debentures but was unable to do so because no buyers could be found.

Plaintiff was present at Merkin's offices almost continuously during business hours from Monday, August 11 through Wednesday, August 13, 1975. During this period, both plaintiff and Corwin attempted to obtain information from GAC regarding the cause of the developments as to the GAC debentures, but they were unable to do so. By Monday, August 11, 1975, plaintiff was aware of the probability of a margin call on his account and was so informed by Corwin. Plaintiff was aware that during the week beginning August 11, 1975, the bid price for the debentures had dropped as low as 42, representing a drop of 30 points in less than a one-week period.

During the week of August 11, 1975, plaintiff knew that the debit balance in his account with Bear, Stearns was approximately $160,000. Plaintiff testified that if the GAC debentures were selling at 42, or $420 each, the value of his 350 GAC debentures, inclusive of accrued interest thereon, was only slightly greater than the $160,000 he owed Bear, Stearns. Exclusive of accrued interest, the value of the securities in plaintiff's account was $13,000 less than the amount he owed Bear, Stearns. Even if interest were included, plaintiff's equity in his account was less than the 25% minimum limitation prescribed by Rule 431 of the New York Stock Exchange.

As early as August 11, 1975, plaintiff was aware that his account was undermargined. Not only had he been advised by Corwin that there was a good probability he would receive a margin call, but on each day during the period August 11 through August 13, 1975, he asked Corwin if a margin call had been issued. During this period, plaintiff was specifically told by Corwin that he was a "likely candidate for a margin call."

During the period from August 11 to August 13, 1975, plaintiff told Corwin that if a call were to be issued after his departure from New York, Corwin should advise plaintiff's father, Sidney Schenck, of the call and that the father, after contacting plaintiff and receiving instructions from him, would then guarantee plaintiff's account and deliver certain bonds owned by the father as additional collateral. The father would not deliver any bonds or meet the call absent specific instructions from plaintiff.

Although plaintiff and Corwin knew that a margin call was imminent, they did not know the precise amount of the additional margin that Bear, Stearns would require. Corwin did not know the value of the bonds owned by plaintiff's father, nor if the bonds, if delivered, would be sufficient to satisfy the call.

It was not until August 12, 1975, that Bear, Stearns learned of the suspension of trading in GAC debentures. On August 13, 1975, David Curtiss, Merkin's treasurer, was informed by Arnold Kornblum, manager of Bear, Stearns' margin department, that as a result of the precipitous decline and suspension of trading in the GAC debentures, Bear, Stearns would be sending out margin calls to customers with positions in GAC. Kornblum told Curtiss that he did not yet know the identity of the specific customers or the amounts of the calls and that he would call back with that information as soon as he had it. Curtiss in turn called Corwin and relayed the information that was available as of that point: that Bear, Stearns would be sending out margin calls to Corwin's customers with positions in GAC but that it had not yet computed the amounts of the calls. Curtiss asked Corwin to contact the customers in order to give them an opportunity to gather funds to meet the anticipated calls.

Upon learning on August 13 of the anticipated margin calls on accounts with positions in GAC, Corwin advised plaintiff of this development and that plaintiff was a candidate for a call. When plaintiff left Merkin's office, he was aware of the fact that he was a candidate for a margin call. Prior to leaving Merkin's office, plaintiff told Corwin that he would telephone him from the airport the next day to ascertain if the call had been issued. By the close of business on August 13, Merkin still had not been apprised by Bear, Stearns of the status of the calls.

In fact, it appears from business records introduced by Bear, Stearns that a margin call was issued by telegram to plaintiff's Paris address on August 13, 1975. The margin call required $84,000 by 11:00 a. m.

the following day. However, there is no evidence that plaintiff himself ever directly communicated with Bear, Stearns, or that there existed an agreement between Bear, Stearns and plaintiff's father concerning the furnishing of any collateral for plaintiff's account.

At approximately 9:20 a.m. on August 14, 1975, plaintiff telephoned Corwin at the Merkin offices and asked if a margin call on his account had been issued. Corwin told plaintiff that some margin calls had gone out on accounts with positions in GAC debentures, but that Corwin did not know whether a call had yet gone out on plaintiff's account and did not know the amounts of the calls or when they were returnable. Corwin told plaintiff that "the situation was grave and that if he could stay around it would be important that he stay around." Corwin stated that based upon his experience plaintiff should have at least two working days to meet the call and that the only exception had been when John F. Kennedy was assassinated. Plaintiff also testified that in his experience margin calls are issued on a minimum of 48 hours notice.

Plaintiff's flight for France departed at approximately 10:00 a.m. August 14. Plaintiff was aware of the probability of a margin call. Plaintiff did nothing to reduce his outstanding indebtedness to Bear, Stearns prior to his departure to France.

On the morning of August 14, between 9:30 and 10:00 a. m., Kornblum called Curtiss and told him the amount of each call and that the collateral had to be posted by 11:00 a. m. that morning. The margin call on plaintiff's account was for $84,000 cash. Pursuant to the instructions which he had received from plaintiff, Corwin called plaintiff's father and advised him of the margin call, and asked him to guarantee the account or meet the call. Plaintiff's father would not guarantee the account or meet the call until after he had an opportunity to confer with his son.

Corwin told Curtiss that plaintiff's father would not furnish collateral until he had an opportunity to confer with plaintiff. Curtiss then requested that Bear, Stearns grant

plaintiff an extension—this request was denied twice.

Plaintiff's account was liquidated at 11:11 a. m. on August 14, 1975. Plaintiff's bonds were sold at a price equal to the highest of three bids by market makers for the GAC debentures. The liquidation resulted in a loss to Bear, Stearns of $7,427.79.

At approximately 10:30 p. m. Paris time on August 14, 1975 (4:30 p. m. New York time), Michelle Schenck, plaintiff's daughter, received a telegram from Bear, Stearns advising plaintiff of the margin call. Plaintiff first saw the telegram at approximately 1:00 a. m. Paris time on August 15, 1975. Plaintiff testified that based upon his experience with trans-Atlantic telegrams it usually takes approximately two and a half to four hours for a telegram to reach Paris after it has been sent from New York. Plaintiff testified that, therefore, the Bear, Stearns telegram could not have been sent prior to noon on August 14, 1975.

On the morning of August 15, 1975, plaintiff telephoned Corwin and was advised that his account had been liquidated by Bear, Stearns.

The parties stipulated during trial that the market value of all securities owned by plaintiff's parents in August, 1975, was approximately $97,000. If plaintiff's father had sought to satisfy the margin call for $84,000 cash by delivery of triple A rated bonds, Bear, Stearns would have required that the market value of those bonds be a minimum of $120,000. While the plaintiff's parents did have an additional savings certificate worth approximately $22,108, this amount could not be freely withdrawn. In any case, they did not attempt to withdraw any of their deposits in connection with the margin call. The securities and cash owned by plaintiff's parents constituted their entire life savings. If they had delivered these assets to satisfy the margin call and if a subsequent call had been issued and not satisfied, and the securities consequently sold, their sole source of income would have been from Social Security.

Plaintiff did not have any assets of his own to satisfy the margin call issued by Bear, Stearns. He was not gainfully employed and had no business/occupation from 1972 through 1975. Plaintiff did not deposit his parents bonds into his account with Bear, Stearns as additional security. In short, plaintiff failed to correct the margin insufficiency in his account even though he was aware that he would probably be receiving a margin call.

Plaintiff has offered no proof to support the allegations in his complaint that: (1) Merkin misrepresented the financial stability of GAC; (2) Merkin was a market-maker in GAC debentures and traded them for its own account and artificially inflated the trading price of the debentures; and (3) Merkin had some unspecified business relationships to GAC Properties, Inc. and GAC, Inc., and in that capacity depleted the assets forming the subject of the debentures.

## CONCLUSIONS OF LAW

█ The crux of plaintiff Schenck's various claims is the assertion that plaintiff and Alvin Corwin, then employed by defendant Merkin, had agreed that delivery of the bonds of plaintiff's father would satisfy a margin call, in the event that defendant Bear, Stearns issued a call during the plaintiff's absence from New York. As this court's findings of fact discuss in greater detail, the existence of such an agreement has not been established by plaintiff. Testimony indicated that plaintiff instructed Corwin that if a margin call were issued after plaintiff had left New York, Corwin should inform plaintiff's father of the call. The father would then contact plaintiff, and deliver the bonds if so instructed by plaintiff.

At the time these instructions were given, neither Corwin nor plaintiff knew what the amount of the margin call would be. Accordingly, there was not an understanding or agreement that the father would necessarily meet the call, or that the father even owned bonds sufficient to satisfy the call.

In fact, Corwin did follow plaintiff's instructions concerning the margin call.

Upon learning of the call, Corwin telephoned the father, advising the father of the terms and conditions of the call.

Any suggestion that plaintiff and Corwin agreed that plaintiff's father would necessarily deliver his bonds to satisfy any margin call is not supported by the evidence. Such an agreement would strain all credibility, as neither plaintiff nor his father knew, at the time, the amount of a margin call in the future. In light of the precarious position of GAC bonds, in addition to the inherent risk of margin securities accounts, such an agreement would have put plaintiff's father at a substantial risk of losing most of his life's savings. The court does not find sufficient credible evidence of such an agreement to meet the margin call.

In light of the absence of any agreement to meet the margin call, plaintiff's claims must all fail.

*Federal Securities Statutes*

Plaintiff alleges that defendants violated Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

Section 17(a) makes unlawful fraud "in the offer or sale" of securities. 15 U.S.C. § 77q. Thus, it is clear that Section 17, in contrast to Section 10(b), protects only purchasers of securities. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733–34, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975). Accordingly, plaintiff has failed to state a claim under Section 17 since his claims do not relate to an offer or sale of securities by defendants to plaintiff. Any federal securities claim by plaintiff must be brought instead under Section 10(b) or Rule 10b–5.

The Supreme Court held in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) [footnote omitted], that a private cause of action will not lie under Section 10(b) and Rule 10b–5 "in the absence of any allegation of 'scienter'—intent to deceive, manipulate, or defraud." The Court did not address "the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5." *Id.* at 193 n.12, 96 S.Ct. at 1381 n.12.

The Second Circuit established in *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44 (2d Cir.) [footnote omitted], *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), that where an alleged aider and abettor of a Rule 10b–5 violation "owes a fiduciary duty to the defrauded party, recklessness satisfies the scienter requirement." The Second Circuit explained that "[r]eckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 47 (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)). As the Second Circuit later noted, however, the court's decision in *Rolf* held only that recklessness may be an appropriate standard for scienter when there is a fiduciary duty. *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979). The Second Circuit in *Rolf* did "not reach the question whether recklessness satisfies the scienter requirement where the alleged aider and abettor owes no duty of disclosure and of loyalty to the defrauded party." 570 F.2d at 44 n.9.

Interestingly, the Second Circuit in *Rolf* did not explicitly extend its holding to apply the recklessness standard to principals owing a fiduciary duty to the defrauded party—the holding is narrowly tailored to aiders and abettors. A careful reading of the *Rolf* opinion suggests, however, that its reasoning may not be limited to the aiding and abetting context. Moreover, the Second Circuit has suggested that the scienter requirement should perhaps be *stricter* with respect to an aider-abettor than with respect to a principal: "'The *scienter* requirement scales upward when activity is more remote . . . .'" *Edwards & Hanly v. Wells Fargo Securities Clearance Corp., supra*, 602 F.2d at 484 (quoting

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir. 1975)).

In any case, this court need not decide in the case at hand whether the Second Circuit's holding in *Rolf* applies beyond the aiding and abetting context. Nor must the court decide whether defendant Merkin was under a fiduciary duty to plaintiff regarding the liquidation of his account. It is clear in the case at hand that plaintiff has not demonstrated the requisite scienter, even under the recklessness standard.

Plaintiff does not allege that either Corwin or any other Merkin officer or employee ever knowingly misled or withheld information from plaintiff in any way. Instead, plaintiff contends that Corwin was reckless in advising plaintiff that plaintiff could travel to Paris. Plaintiff thus suggests that Corwin's reliance upon information from Bear, Stearns, indicating there was no call on plaintiff's account at the time, constituted recklessness. This court does not find that Corwin's conduct was highly unreasonable or represented an extreme departure from the standards of ordinary care. No indication in the evidence suggests that either Corwin or defendant Merkin acted in anything other than good faith.

For example, the evidence in this case demonstrates that defendant Merkin promptly transmitted to plaintiff information furnished by Bear, Stearns relating to plaintiff's account. On August 13, 1979, defendant Merkin informed plaintiff that he would be receiving a margin call, based upon the condition of his account and information received by Bear, Stearns. At the time of the margin call, Corwin immediately notified plaintiff's father pursuant to plaintiff's instructions. While defendant Merkin did not have responsibility or discretion over plaintiff's account and margin calls, defendant Merkin did seek, unsuccessfully, additional time for plaintiff to meet the call. In short, the evidence simply does not support a finding of recklessness on the part of defendant Merkin or its employee, Corwin.

Any suggestion that defendant Bear, Stearns deceived or misled plaintiff is equally unsupportable. At no time did Bear, Stearns make any representations to plaintiff which might give rise to a violation of Section 10(b) or Rule 10b–5. In light of these conclusions, plaintiff has not established a violation of federal securities laws.

In this respect, the case is not unlike the situation in *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442 (2d Cir. 1971). In *Shemtob*, the plaintiffs sought damages resulting from the defendant broker's liquidation of a margin account for margin insufficiency. The account had been undermargined for a period of nine days when the defendant liquidated the account without warning to the plaintiffs. The Second Circuit held that, absent any allegation of facts amounting to scienter, the complaint failed to state a claim under Section 10(b) or Rule 10b–5:

> These allegations, even when accepted as true and construed liberally and most favorably to the pleader, amount to a claim that Shearson [defendant] failed to sell out the Shemtobs [plaintiffs] promptly, as stated in Shearson's May 1 telegram (even though the underlying February 4, 1969, agreement gave Shearson wide discretion in this respect) and that Shearson eventually sold them out without giving them an opportunity to post additional margin, in breach of the alleged May 4, 1970, oral "novation" or modification of the February 4, 1969, written agreement. Thus plaintiffs' claim is nothing more than a garden-variety customer's suit against a broker for breach of contract, which cannot be bootstrapped into an alleged violation of § 10(b) of the Exchange Act, or Rule 10b–5, in the absence of allegation of facts amounting to *scienter*, intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme or artifice to defraud. It is insufficient to allege mere negligence, . . . . breach of contract or breach of a stock exchange rule . . . .

*Id.* at 445.

In the case at hand, plaintiff has failed to prove scienter on the part of defendants,

even under the recklessness standard. Under these circumstances, plaintiff's claims under Section 10(b) and Rule 10b–5 must be denied.

*General Business Law § 352–c*

■ Plaintiff also maintains that defendants conduct violated New York General Business Law § 352–c (McKinney). Section 352–c(1) prohibits fraud, deception, concealment, and various other forms of false representation "where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities." The purpose of this statute is "to protect the general public against fraud in the sale of securities." *Herdegen v. Paine, Webber, Jackson & Curtis*, 31 Misc.2d 104, 105, 220 N.Y.S.2d 459, 460 (Sup. Ct.1961); *accord, Lupardo v. I. N. M. Industries Corp.*, 36 F.R.D. 438, 439 (S.D.N.Y. 1965). Thus, it has been explained that Section 352–c "prohibits 'all deceitful practices contrary to the plain rules of common honesty. [Citation omitted.] Its purpose is to defeat any scheme whereby the public is exploited. * * * All acts tending to deceive or mislead the public, whether or not the product of *scienter* or intent to defraud, come within its umbrella. [Citations omitted.]'" *Jones Memorial Trust v. Tsai Investment Services, Inc.*, 367 F.Supp. 491, 498 (S.D.N.Y.1973) (quoting *People v. Cadplaz Sponsors, Inc.*, 69 Misc.2d 417, 419, 330 N.Y.S.2d 430, 432 (Sup.Ct.1972)) [bracketed material and asterisks in original].

This court concludes that Section 352–c does not apply to representations regarding the margin call or account liquidation involved in the case at hand. Section 352–c, by its own terms, applies "where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase" of securities. The representations alleged by plaintiff to have been made by defendant Merkin were clearly not made to induce or promote the sale or purchase of securities. Plaintiff has failed to demonstrate that the alleged representations by defendant Merkin or the liquidation of his account by defendant Bear, Stearns were to

induce or promote the purchase or sale of GAC debentures by plaintiff.

Plaintiff has offered no authority whatsoever suggesting that Section 352–c should be construed so as to apply to the account liquidation in the case at hand. In fact, the rather sparse case law relevant to this point would seem to suggest a contrary result. For example, in *Herdegen v. Paine, Webber, Jackson & Curtis, supra*, 31 Misc.2d at 105, 220 N.Y.S.2d at 460, a New York lower court noted that Section 352–c prohibits "misstatements and representations by persons engaged in the sale of securities." The *Herdegen* court declined to apply the statute to cover a purchaser who did not make a purchase from the misrepresenter, but made purchases from another broker instead. In the case at hand, plaintiff did not purchase or sell securities from defendants as a result of the alleged representations, nor were the alleged representations designed to induce or promote such a purchase or sale. Accordingly, plaintiff cannot maintain a claim under Section 352–c.

*Common Law Fiduciary Obligations*

Plaintiff asserts in his Post-Trial Memorandum of Law and in his Proposed Findings of Fact, and Conclusions of Law that New York General Business Law § 352–c prohibits a misrepresentation by one to whom the author is bound by some relation or duty, arising out of contract or otherwise, to act with care if he acts at all. Plaintiff's citation of *White v. Guarante*, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977), in support of this proposition is entirely unfounded, as *White* does not involve Section 352–c in any way. Instead, *White* involved an action for negligent misrepresentation.

■ Plaintiff is correct insofar as he asserts that New York common law may impose a fiduciary obligation upon a broker. Under New York law, the relation between a customer and his stock broker is that of principal and agent. *People v. Mercer Hicks Corp.*, 4 Misc.2d 55, 155 N.Y.S.2d 740, 744 (Sup.Ct.1956), *aff'd*, 3 A.D.2d 708, 160 N.Y.S.2d 806 (1st Dept. 1957); *see Robinson v. Merrill Lynch, Pierce, Fenner & Smith*,

*Inc.*, 337 F.Supp. 107, 110–11 (N.D.Ala. 1971), *aff'd*, 453 F.2d 417 (5th Cir. 1972). As an agent, a broker has a duty to use reasonable efforts to give his principal information relevant to affairs entrusted to the broker. *See* Restatement (Second) of Agency § 381.

Accordingly, before a fiduciary duty applies, it must be shown that the information in question was relevant to affairs entrusted to the broker. The scope of affairs entrusted to a broker is generally limited to the completion of a transaction. Thus, it was held in *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra*, 337 F.Supp. at 111:

> The relationship of agent and principal only existed between plaintiff and defendant when an order to buy or sell was placed, and when the transaction was complete. That is, defendant was a broker and nothing more. It then becomes clear that defendant's duty, in the language of § 381 of the Restatement of Agency 2d quoted above, is a duty to "use reasonable efforts" to give the principal information relevant to the affairs entrusted to it. The affair entrusted to a broker who is to buy or sell through an exchange is to execute the order, not to discuss its wisdom.

*See also Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951 (E.D. Mich.1978) (drawing distinction between discretionary and nondiscretionary accounts).

■ In the case at hand, plaintiff has not demonstrated that defendant Merkin had any fiduciary obligation to plaintiff with respect to the margin call or liquidation of plaintiff's account. Plaintiff has failed to demonstrate that the supervision of plaintiff's account for compliance with margin requirements was a matter entrusted to Merkin, who did not have discretion or responsibility to liquidate the account.

In fact, the clearing agreement between Merkin and Bear, Stearns provides that Merkin had neither discretion nor responsibility over supervision of plaintiff's account for compliance with margin requirements,

liquidation of plaintiff's account, or transmission to plaintiff of margin calls. Such discretion and responsibility rested exclusively with Bear, Stearns. Plaintiff acknowledged that he was aware that any obligation to notify him of a margin call rested with Bear, Stearns. In short, as these matters were not entrusted to Merkin, there was no fiduciary obligation between Merkin and plaintiff with respect to margin calls or liquidation.

In any case, assuming *arguendo* the existence of some fiduciary relationship between Merkin and plaintiff, plaintiff has not demonstrated that Merkin failed to exercise "the utmost good faith" toward plaintiff. *See Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra*, 444 F.Supp. 417, 423 (E.D.N.Y.1978) (quoting *Elco Shoe Manufacturers v. Sisk*, 260 N.Y. 100, 103, 183 N.E. 191, 192 (1932)). Thus, not only has plaintiff failed to demonstrate the existence of any relevant fiduciary obligation, but also plaintiff has failed to show any breach of the alleged obligation by Merkin. Thus, any claim by plaintiff must be directed instead at defendant Bear, Stearns.

*Liquidation of Plaintiff's Account by Bear, Stearns*

Plaintiff alleges that Bear, Stearns liquidated plaintiff's account without notice, and that Bear, Stearns was estopped from doing so by representations made by Merkin, allegedly an agent of Bear, Stearns. In order to prevail on this claim against Bear, Stearns, plaintiff must establish: 1) that plaintiff's account was liquidated without notice; and 2) that Merkin was an agent of Bear, Stearns.

■ 1) *Was plaintiff's account liquidated without notice?* Plaintiff's account was liquidated by Bear, Stearns at 11:00 a. m., August 14, 1975, New York time. As this court's findings of fact discuss in detail, plaintiff has not proved that the account was liquidated prior to the sending of notice. As all records of the transmission by Bear, Stearns of its notice telegram are missing, the time of the telegram's issuance is unknown. While testimony indicated

that the telegram was received at plaintiff's Paris residence at 7:00 p. m., August 14, 1975, New York time (1:00 a. m. August 15, 1975, Paris time), this evidence is not sufficient to demonstrate that Bear, Stearns liquidated plaintiff's account without first sending notice. Moreover, Bear, Stearns quite properly sent the telegram notice to plaintiff's Paris address; the agreement between Bear, Stearns and plaintiff provided that notice should be mailed to the Paris address until Bear, Stearns received from plaintiff notice in writing of a different address. Plaintiff never instructed Bear, Stearns to send notice to any other address than the Paris address. Accordingly, plaintiff has not shown that his account was liquidated without proper notice.

2) *Was Merkin an agent of Bear, Stearns?* Assuming, *arguendo*, that Bear, Stearns liquidated plaintiff's account without prior notice, plaintiff must somehow avoid the clear language of paragraph 3(b) of the Customer's Agreement, which provides that Bear, Stearns may sell any or all property held in any of plaintiff's accounts without notice to plaintiff. Plaintiff argues that Merkin, as an agent of Bear, Stearns, waived this provision of the Customer's Agreement by promising that the account would not be liquidated without giving plaintiff notice or an opportunity to meet the margin call.

Plaintiff's assertion that Merkin was acting as agent of Bear, Stearns is without merit. Plaintiff bases his assertion on the fact that Merkin was responsible under the terms of its agreement with Bear, Stearns to secure from plaintiff a signed customer agreement. Moreover, plaintiff argues, plaintiff often dealt with Merkin with regard to proper maintenance of the margin in his account.

 This court concludes that plaintiff has failed to prove the existence of an agency relationship. Plaintiff has not demonstrated that Bear, Stearns conferred either actual authority or apparent authority upon Merkin. There has been no showing that Bear, Stearns authorized or permitted Merkin to make representations on behalf

of Bear, Stearns. It is clear that only authorized representations of an alleged agent can be a basis for apparent authority. *See Gumpert v. Bon Ami Co.*, 251 F.2d 735, 739 (2d Cir. 1958) (applying New York law). Moreover, in order to rely upon any alleged apparent authority of Merkin, plaintiff was bound to inquire to ascertain the actual authority of Merkin. *See Franhan Distributors, Inc. v. New York World's Fair 1939, Inc.*, 124 F.2d 82, 85 (2d Cir. 1941) (applying New York law).

 In fact, the Clearance Agreement between Bear, Stearns and Merkin does provide that Merkin was responsible for obtaining a signed Customer's Agreement from plaintiff; however, nothing else in the Clearance Agreement suggests that Merkin was in any other way Bear, Stearns's agent. The Clearance Agreement specifically provided that "responsibility for maintaining proper margin is solely that of Bear, Stearns." Moreover, nothing in the Customer's Agreement indicates that Merkin was to act as agent for Bear, Stearns in connection with maintenance of plaintiff's margin account.

During the trial, Corwin, an employee of Merkin, testified that he told plaintiff that "in my opinion, in the normal course of events, he would have time to meet the call." Such a statement by Corwin to plaintiff certainly falls short of indicating that Merkin had actual or apparent authority from Bear, Stearns to grant plaintiff time to meet a margin call.

Finally, plaintiff's failure to communicate with Bear, Stearns any inquiry as to Merkin's authority precludes any theory of apparent authority. At no time did Bear, Stearns lead plaintiff to believe that Merkin was authorized to act on behalf of Bear, Stearns in connection with margin maintenance. As discussed above, Merkin may have been *plaintiff's* agent for limited purposes; plaintiff has not proved that Merkin was Bear, Stearns's agent.

Given that any representations made by Merkin were not made on behalf of Bear, Stearns, the conclusion must follow that

Bear, Stearns was free to liquidate plaintiff's account without notice. Paragraph 3(b) of the Customer's Agreement between plaintiff and Bear, Stearns clearly allowed such a liquidation:

You may, in the event of my death or whenever in your discretion you consider it necessary for your protection, sell any or all property held in any of my accounts, cancel any open orders for the purchase or sale of any property with or without notice to me, and you may borrow or buy in any property required to make delivery against any sale, including a short sale, effected for me. Such sale or purchase may be public or private and may be made without advertising or notice to me and in such manner as you may in your discretion determine, and no demands, calls, tenders or notices which you may make or give in any one or more instances shall invalidate the aforesaid waiver on my part. At any such sale you may purchase the property free of any right of redemption and I shall be liable for any deficiency in my accounts.

Thus, the Customer's Agreement explicitly provides not only that no notice of liquidation is necessary, but also that no actions of Bear, Stearns shall invalidate plaintiff's waiver of notice.

■■■ The evidence in this case clearly demonstrated that it was not an unreasonable exercise of discretion for Bear, Stearns to consider it necessary for its protection to liquidate plaintiff's account. The market for GAC bonds was fluctuating wildly and plaintiff's account was already substantially in deficit.

Thus, it would appear that Bear, Stearns's decision to liquidate plaintiff's account was in full compliance with the Customer's Agreement. Moreover, any representations made by Merkin, even if assumed to be the agent of Bear, Stearns, would not invalidate the Customer's Agreement. The terms of the Customer's Agreement are beyond dispute: "no demands, calls, tenders or notices which you [Bear, Stearns] may make or give in any one or more instances shall invalidate the afore-

said waiver [of notice] on my [plaintiff's] part."

*Bear, Stearns's Counterclaim*

Under the terms of the Customer's Agreement, plaintiff agreed to be liable for any deficiency in his account. A deficit exists when the market value of securities in the account does not equal or exceed the amount of money which the customer owes the broker in connection with the account.

As discussed above, Bear, Stearns issued a margin call on plaintiff's account by telegram on August 13, 1975, requiring $84,000 by 11:00 a. m. the following day. When the margin call was not met, plaintiff's bonds were sold at 11:00 a. m. on August 14, 1975. After the liquidation, plaintiff's account contained a deficit of $7,427.79. Plaintiff has refused to pay this amount although duly demanded by Bear, Stearns.

■■■ Bear, Stearns has filed a counterclaim against plaintiff for $7,427.79, plus interest from August 29, 1975. This counterclaim is well within the pendant jurisdiction of this court, since the counterclaim and plaintiff's claims are derived from a "common nucleus of operative fact." *United ed Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Disposition of defendant Bear, Stearns's counterclaim is in the interest of judicial economy, convenience, and fairness to the parties.

Given this court's conclusion that the liquidation of plaintiff's account was entirely proper, plaintiff is obligated to pay Bear, Stearns any deficit resulting from the liquidation.

*Conclusion*

For the reasons set forth in this opinion, this court concludes that plaintiff's complaint in this action should be dismissed and judgment entered for defendants. A judgment in favor of defendant Bear, Stearns's counterclaim in the amount of $7,427.79 plus accrued interest from August 29, 1975 should be entered.

Defendants are hereby ordered to submit a proposed order within five days of the filing of this opinion.

SO ORDERED.