**B.F. HIRSCH, INC., Plaintiff,**

v.

**ENRIGHT REFINING COMPANY, Defendant.**

Civ. A. No. 81–1064.

United States District Court, D. New Jersey.

Nov. 17, 1983.

Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A. by Lawrence T. Neher, Newark, N.J., Schulte, Roth & Zabel by David M. Brodsky, Robert M. Abrahams, Aegis J. Frumento, New York City, for plaintiff.

McCarter & English by John L. McGoldrick, John F. Brenner, Newark, N.J., for defendant.

## OPINION

CLARKSON S. FISHER, Chief Judge.

This is an action brought by B.F. Hirsch, Inc. against defendant, Enright Refining Company, Inc., alleging breach of contract and fraudulent misrepresentation. Plaintiff seeks to recover the sum of $111,-175.84, plus treble damages, pursuant to the Racketeer Influenced and Corrupt Organizations Act. Hirsch claims that Enright breached the agreement between the parties by retaining certain percentages of the precious metals sent to the defendant for refining. Defendant argues that the charging of a retainage fee is consistent with industry practice and that plaintiff knew or should have known that defendant adhered to this practice.

There are a number of issues in dispute in this case. These include (1) whether the defendant was entitled, under the contract between the parties, to impose a retainage charge; (2) whether defendant misrepresented its refining charges to plaintiff by failing to state that it imposed a retainage charge; (3) whether defendant's conduct constituted an activity prohibited by 18 U.S.C. § 1962(b) & (c), and § 1964(c); and (4) whether the use of a retainage fee was a regularly observed practice in the refining industry. The following are the court's findings of credible facts and conclusions of law as required by Fed.R.Civ.P. 52(a).

Plaintiff, B.F. Hirsch, Inc. (Hirsch), is a New York corporation which manufactures gold jewelry, primarily gold wedding and engagement rings. Defendant, Enright Refining Company, Inc. (Enright), is a refiner of precious metals and is located in Newark, New Jersey. Plaintiff employed the services of defendant to refine the scrap gold collected at the manufacturer's plant.

The gold used in the manufacture of jewelry is known as "karat gold." Karat gold is not pure or fine gold but is an alloy of gold and other precious metals. Fourteen-karat gold, for example, is $^{14}/_{24}$ths gold and $^{10}/_{24}$ths other metals. Pure or fine gold (24 karat) is .995%, or more, gold.

During the jewelry manufacturing process, scraps of karat gold are created in the form of grindings, lathe clippings, polish dust, etc. These scraps are collected by the manufacturer and sent to a refiner to be reduced to the component precious metals. These pure precious metals are then

returned to the manufacturer for use in new jewelry. In some instances, however, the metals are not returned. Instead, the refiner pays cash to the manufacturer who then purchases the metals on the open market.

There are four different methods used by refiners to charge for their services. First, a "refining charge" may be used. This charge is a flat rate per ounce or a percentage of the gross precious metal value. Secondly, if the refined metals are physically returned to the manufacturer a "returnable charge" may be used. This charge is a fixed rate per ounce of metal returned. If the manufacturer elects to receive cash for the gold and silver, a third charge could be used, the "cents-off charge". In that instance, the refiner pays for the precious metals at a rate lower than the London market price. The final charge used by refiners is the "retainage charge." There, the refiner agrees to return only a portion of the metals sent to him for refining. A certain percentage of the metal is retained as partial payment for the services rendered. These charges are used in different combinations by refiners and the rates or percentages of the individual charges also vary by refiner.

Hirsch employed the refining services of Enright Refining Company and Enright Refining Company, Inc. 68 times between 1973 and 1978. Enright Refining Company was owned by John A. Enright until September of 1976, and 47 of the gold shipments were refined during this period. These shipments were assessed a refining charge plus either a cents-off or a returnable charge. These charges were reflected in the reports sent to Hirsch after each shipment was processed. Enright Refining Company did not assess a retainage fee during the period from 1973 through September 1976.

In September 1976 the assets of Enright Refining Company were sold to the present defendant, Enright Refining Company, Inc., an entity distinct and separate from its predecessor. However, this change of ownership was not readily noticeable, as the operations of Enright continued undisturbed and with the same personnel. Enright began charging Hirsch a retainage fee in October 1976. No notice of the change was given to Hirsch and the report letters sent did not reflect the new charge. In fact, the "contents" section of the report letters indicated weight *after* retainage was deducted thereby masking the retainage fees. Between 1976 and 1978 Enright's retainage percentage was 0.5% for gold and 1.5% for silver. Due to the small size of the retainage percentages, it was not possible for Hirsch to determine that any retainage had been assessed.

During the period from October 1976 through December 1977 Hirsch sent 21 shipments to Enright for refining. Throughout this time Hirsch was unaware that a retainage was being charged and that the report letters did not reflect the total contents of the shipments. The parties have stipulated that the amount of $12,196.19 represents the retainage fee charged by Enright during this period. Following the December 1977 transaction, the parties did not deal again until October 1980.

Hirsch employed the services of Enright on two occasions in 1980. Prior to these dealings, but subsequent to their final transaction in 1977, executives from both companies attended a meeting at Hirsch's corporate offices. Although the testimony is varied on when this meeting occurred, I find that it took place in the Spring of 1978. This meeting was attended by Arthur Buxbaum, Jerry Sachs, and George Schneider for Hirsch, and by James Burnett and Gerard Turner on behalf of Enright. The testimony regarding this meeting conflicts drastically as to the subjects of discussion. Turner and Burnett stated that all of Enright's charges, including retainage, were discussed in comparison to an invoice from Englehard Industries, the refiner being used by Hirsch at the time. The Hirsch executives agreed that an Englehard invoice had been examined but also stated that the Enright executives merely said that they "could do better" without

discussing retainage. The Hirsch executives described the meeting as a "missionary type" meeting through which Enright hoped to regain an old customer.

In September of 1980 Enright sent a typed price list to Hirsch which listed its refining charges as (1) refining charge; (2) cents-off charge; and (3) a returnable charge. The price list did not list a retainage charge nor did it state anywhere that such a charge would be made. In light of this price list and the above discussed testimony, I find that Enright did not disclose, and Hirsch was not aware of, any retainage fees charged by Enright for refining services.

Hirsch sent a shipment of ten and fourteen-karat gold scrap to Enright on September 18, 1980. In addition to other charges, Enright retained 2% of the fine gold and 5% of the fine silver in that shipment. A report letter was sent to Hirsch on October 17, 1980, but due to the mixture of ten and fourteen-karat scrap in the shipment no calculation could be made to confirm the report. A second shipment was sent to defendant on October 27, 1980. This shipment contained only fourteen-karat-gold scrap and was also charged a retainage fee. It is noted that the report letters listed contents after retainage was deducted but did not indicate that the deduction had been made. After receiving a report letter dated November 24, 1980, Hirsch compared its expected return to what it actually received and confronted Enright with its questions. At that point Enright explained that the discrepancy was due to its retainage fee. Thereafter, Hirsch brought this suit seeking to recover the amounts retained by defendant. The parties have stipulated that the amount of $98,979.65 represents the retainage charged by Enright for the 1980 shipments.

■ Examining first the 21 transactions which occurred between September 1976 and December 1977, this court finds that the assessment of a retainage fee constituted a breach of the oral contract between the parties. Hirsch had dealt with Enright for a number of years and had never been charged a retainage fee. This fee was imposed without notification and without the knowledge of Hirsch. Hirsch had not agreed to the imposition of this charge and, indeed, it had never been discussed as a potential part of the agreement between the parties. Therefore, I find that defendant breached its contract with Hirsch by assessing the retainage fee.

■ Under New Jersey law, the following elements must be proven to establish a *prima facie* case of fraudulent misrepresentation (1) a material misrepresentation of a presently existing or past fact; (2) knowledge of the falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied on; (4) reliance on the misrepresentation; and (5) damage to the party who relied on the misrepresentation. *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981). Using these elements as the relevant criteria, I find that defendant fraudulently misrepresented its charges to Hirsch during the 1976 through 1977 period. During that period Hirsch acted on the presumption that Enright's charges had not changed since it had not been notified of any change. Enright's failure to disclose the retainage fee is a misrepresentation by omission. See—*Weintraub v. Krobatsch*, 64 N.J. 445, 455, 317 A.2d 68 (1974). In addition, Enright acted affirmatively to conceal the assessment of the fee by listing the contents of the shipments in the report letters as the amount after deduction of retainage. By these acts Enright intended that Hirsch be deceived into sending gold scrap to defendant for refining and that Hirsch be deceived into accepting in payment an amount less than that contracted for. Hirsch did rely on Enright's representations and omissions and was thereby harmed. Therefore, I find that Enright is liable to Hirsch for fraudulent misrepresentation as to the transactions occurring between September 1976 and December 1977.

Turning to the 1980 transactions, the contract analysis is basically the same as for the earlier contracts. Hirsch entered into oral contracts with Enright in 1980

based substantially on the typed price sheet supplied by Enright. These agreements did not contemplate the assessment of a retainage fee by defendant and, therefore, any such assessment constituted a breach of the contracts.

This court also finds that Enright is liable for fraudulent misrepresentation as to the 1980 transactions. Enright's misrepresentation was one of omission rather than of commission. By failing to disclose its retainage fee to Hirsch either at the 1978 meeting or through its price sheet, Enright intended to and did induce Hirsch into entering into the contracts for refining. Hirsch relied on these representations and has been damaged by that reliance. It is further noted that Enright continued its misrepresentation by not disclosing the true "contents" of the gold shipments in its report letter. Accordingly, I find Enright liable for fraudulent misrepresentation as to the 1980 transactions.

### Affirmative Defenses

Defendant claims that plaintiff's recovery must be barred or limited by the statute of limitations as well as the statute of frauds. In a number of the transactions between the parties Hirsch elected to receive cash for the gold sent to Enright rather than have the gold returned. The parties agree that these transactions are covered by article 2 of the Uniform Commercial Code and defendant argues that U.C.C. provisions bar recovery for these transactions. N.J.S.A. 12A:2–725 provides in part

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.

. . . .

(4) This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Act becomes effective. L.1961, c. 120, § 2–75.

The case at bar was filed on April 10, 1981, and defendant argues that therefore any transactions covered by the U.C.C. which occurred prior to April 10, 1977, are barred. This however, is not the case.

■ "It is well established in New Jersey that where there is fraudulent concealment of a cause of action the period of limitation will not commence until recovery of wrong or of facts which reasonably put one on notice." *Foodtown v. Sigma Marketing Systems, Inc.*, 518 F.Supp. 485, 488 (D.N.J.1980); see *Roberts v. Magnetic Metals Co.*, 463 F.Supp. 934 (D.N.J.1978); *Kohler v. Barnes*, 123 N.J.Super. 69, 301 A.2d 474 (Law Div.1973). There are two distinct types of fraudulent behavior which toll a statutory period. The first involves active concealment by a defendant after a fraud is committed. The second involves a fraud which goes undiscovered even though the defendant has done nothing to conceal the fraud. In the second case, the period of limitations begins to run when plaintiff should have discovered the fraudulent scheme, *Roberts v. Magnetic Metals Co.* at 946, not when the scheme is ultimately uncovered.

■ In the present case, Hirsch did not discover the discrepancy in gold returned caused by the imposition of the retainage fee until 1980. The gold retained by Enright during the 1976 to 1977 period is a small portion of the total claim in this case. In those early transactions the percentage retained was relatively small, which made it impossible for Hirsch to discover the retainage. In addition, the prior course of dealing between the parties led Hirsch to expect that no retainage would be charged. However, in 1980 when the percentage was raised, Hirsch immediately became aware of the charge and took prompt action. I find that the statute of limitations was tolled until the 1980 discovery of the dis-

crepancy by Hirsch. Therefore, defendant's arguments here are without merit.

■ Defendant cites N.J.S.A. 12A:2–201, the U.C.C. statute of frauds, as authority for the argument that plaintiff's contract claims are invalid. This reasoning is also faulty. N.J.S.A. 12A:2–201(3) states in part that "[a] contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable ... with respect to goods for which payment has been made and accepted or which have been received and accepted...." In the present case, Hirsch has delivered and Enright accepted the shipments of gold. All that remains to be performed is the promise of Enright to return the gold or pay the value of such gold. In *Edwards v. Wyckoff Electrical Supply Co.*, 42 N.J.Super. 236, 242, 126 A.2d 29 (App.Div.1956), the court stated that

> wherein it is evident that the plaintiff has fully and completely performed all of the services contemplated to be accomplished by him pursuant to the oral contract, leaving only the unilateral promise of the defendant to remunerate the plaintiff, the application of the pertinent provision of the statute would produce intolerable mischief by depriving the plaintiff who has in good faith irretrievably discharged his undertaking of the fruits of his labor. *Vide, Cauco v. Galante*, 6 N.J. 128, 138 [77 A.2d 793] (1951). Such is not the design of the statute.

Accordingly, I find that the oral contracts in the present case are without the statute of frauds.

■ Defendant's final argument is that the terms of the contracts between the parties were supplemented by the customs and usage of the trade. N.J.S.A. 12A:2–202 states in pertinent part that

> [t]erms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contemporaneous oral

agreement but may be explained or supplemented

> (a) by course of dealing or usage of trade (12A:1–205) or by course of performance (12A:2–208); and ...

New Jersey common law also provides that a contract may be explained or supplemented by a trade custom or usage. See *Ace Stone, Inc. v. Wayne Township*, 47 N.J. 431, 221 A.2d 515 (1966); *Beachcomber Coins, Inc. v. Boskett*, 166 N.J.Super. 442, 400 A.2d 78 (App.Div.1979). Defendant claims that the practice of retaining a percentage of the refined precious metals is a custom of the precious-metals trade.

■ In *Ace Stone, Inc. v. Wayne Township*, the court stated "[t]he admitted goal [contract interpretation] is to ascertain and effectuate the contemplation or common intention of the parties.... Towards that goal, formal interpretative rules are readily subordinated and parol evidence of the attendant circumstances including trade practices and customs is clearly admissible...." 47 N.J. at 439, 221 A.2d 515 (citations omitted). It should be noted that use of a trade custom or usage is for the purpose of interpreting the indeterminate intentions of the parties—not for adding new terms to a contract.

■ In the present case, defendant's claims must fail for two reasons. First, defendant has failed to prove that the practice of charging a retainage is "so prevalent as to warrant the conclusion that the parties contracted with reference to, and intended their agreement to be governed by it...." *Beachcomber Coins, Inc. v. Boskett*, 166 N.J.Super. at 447, 400 A.2d 78 (citation omitted). In fact, testimony indicated that while retainage fees were common not all refiners used them. Further, the percentages strains credibility to believe that the two report letters whose listed charges were approximately $15,000 would be supplemented by trade custom to the amount of almost $100,000, seven times the reported amount. I find that no trade custom or usage has been proven.

The second reason for the failure of defendant's argument is the prior course of dealing between the parties. During the period from 1973 through September 1976, Hirsch and Enright dealt on numerous occasions and no retainage fee was ever imposed. Hirsch, therefore, could reasonably expect that practice to continue unless some notice was given by defendant. This prior course of dealing is directly opposite the trade custom defendant seeks to establish. Therefore, I find that the oral agreement between the parties was not supplemented by trade custom or usage and that the imposition of a retainage fee breached those contracts.

### RICO Claims

Plaintiff seeks, *inter alia,* treble damages which are statutorily provided under the civil-remedies provisions of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Plaintiff alleges that defendant's repeated acts of fraudulent misrepresentation, evidenced by the report letters omitting the improperly withheld retainage charges, constitute mail and wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343, respectively. As set out hereunder, I find that the substantive elements necessary to state a claim for damages under RICO have been established and, therefore, plaintiff is entitled to the relief sought.

Title IX of the Organized Crime Control Act of 1970, "Racketeer Influenced and Corrupt Organizations," Pub.L. No. 91–452 § 901–904, 84 Stat. 922, 941–948, codified at 18 U.S.C. §§ 1961–1968 (1976), provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue [in federal court] ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

In its complaint plaintiff alleges defendant violated sections 1962(a) and (c) of the Act, thereby causing injury to plaintiff's business and property. With respect to plaintiff's allegations, only section 1962(c) will be considered here, as I find it dispositive of plaintiff's claim. Section 1962(c) provides that

[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

As the Supreme Court has repeatedly indicated, the scope of a statute is to be determined initially by examining its text. *Lewis v. United States,* 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). The scope of RICO is no exception. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). My analysis therefore begins with the language of section 1962(c) and, in particular, the key definitional phrases contained therein.

■ Under section 1961(3), "person" is defined to include "any ... entity capable of holding a legal or beneficial interest in property." This definition is not limited by the text of the statute and will not support any argument to exclude defendant. "Enterprise," according to the statute, "includes any individual, partnership, *corporation,* association, or other legal entity, any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). It is undisputed that a legitimate business, such as defendant corporation, admittedly engaged in interstate commerce, constitutes an enterprise within the meaning of section 1962(c). *United States v. Turkette,* 452 U.S. at 580, 101 S.Ct. at 2527; *United States v. Brown,* 583 F.2d 659, 663 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979); *Seville Indus. Mach. v. Southmost Mach. Corp.,* 567 F.Supp. 1146, 1150 (D.N.J.1983).

The text of RICO requires the showing of two separate elements as defined above, "person" and "enterprise." Certain courts have argued that these terms are mutually exclusive and that a defendant may not

assume both identities. *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Bennett v. Berg*, 685 F.2d 1053, 1061 (8th Cir.1982). To date this circuit has not addressed this precise issue. However, it should be recognized that nothing on the face of the statute compels such a conclusion. In addition, there is ample support for my finding that the terms are not mutually exclusive. In *United States v. Hartley* the Eleventh Circuit addressed this issue in a criminal context and stated

> [c]onsidering the broad reading given the term "enterprise" in *Turkette*, the Court's willingness to expand the scope of RICO's application, and absent any prohibition of [the corporation] assuming a dual role, we answer our inquiry in the affirmative. A corporation may be simultaneously both a defendant and the enterprise under RICO.

678 F.2d 961, 988 (11th Cir.1982). In this district, Judge Debevoise, in *Seville Indus. Mach. v. Southmost Indus. Mach. Corp.*, chose not to reach this issue. However, his analysis of the cases in support of both arguments provides some insight. In analyzing *United States v. Riccobene*, 709 F.2d 214 (3d Cir.1983), Judge Debevoise correctly noted that the court

> recited three elements of an enterprise: (i) an ongoing enterprise, (ii) functioning of the associates as a continuing unit and (iii) the existence of the enterprise separate and apart from the pattern of activity in which it engages. The Court referred to the latter criterion as "the third and *final* element in establishing the enterprise" at 223 (emphasis added).

567 F.Supp. at 1154. Judge Debevoise concluded his analysis by stating that "[t]aken literally, that characterization [in *Riccobene*] suggests that there is no fourth element of an enterprise, that is, a separate identity between the enterprise and the racketeers." *Id.*

In further support of this proposition are two unreported decisions in this district, both of which note with approval the hold-ing of *United States v. Hartley*, 678 F.2d 961. *See Mooney v. Fidelity Union Bank*, Docket Nos. 82–3192, 3193 (March 22, 1983) (Ackerman, J.); *Coastal Steel Corporation v. Chemical Bank*, Docket No. 82–1714 (Oct. 27, 1982) (Thompson, J.) I find that plaintiff has alleged and proven each of the *Riccobene* elements, and that it is within the proper statutory construction to treat a defendant as both an "enterprise" and a "person," the terms being not mutually exclusive.

▪ Turning next to section 1961(5), it defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" occurring within ten years of each other. Correspondingly, section 1961(1)(B) defines "racketeering activity" to include mail and wire fraud under sections 1341 and 1343, respectively, of title 18. In this case, such a pattern was clearly established by the series of fraudulent report letters emanating from defendant's New Jersey office and sent via the United States Postal Service to plaintiff's offices in New York. Mail fraud is established by "any scheme or artifice to defraud, or for obtaining money or property by means of false pretenses, representations, or promises." 18 U.S.C. § 1341. *See United States v. Boffa*, 688 F.2d 919, 925 (3d Cir. 1982). The parameters of the mail-fraud statute are to be expansively construed to prohibit all schemes to defraud by any means of misrepresentation using the postal system and should not be artificially constrained to dispose of plaintiff's claim. *See United States v. Boffa*, 688 F.2d at 925; *United States v. Pearlstein*, 576 F.2d 531, 534 (3d Cir.1978).

▪ It should be noted also that a number of cases have analyzed the scope and effect of RICO and have determined that the legislative history of the statute reveals a clearly expressed legislative intent that RICO should apply only to actions involving organized crime activities. *Waterman Steamship Corp. v. Avondale Shipyards, Inc.*, 527 F.Supp. 256, 260 (E.D.La.1981); *Adair v. Hunt International Resources, Inc.*, 526 F.Supp. 736 (N.D.Ill.1981); *Barr*

*v. WUI/TAS, Inc.*, 66 F.R.D. 109 (S.D.N.Y. 1975). A thorough review of the legislative history of the Act reveals no clearly expressed legislative intent to limit the scope of RICO. This recently has been recognized in this and two other circuits. *United States v. Vignola*, 464 F.Supp. 1091, 1096 (E.D.Pa.), *aff'd*, 605 F.2d 1199 (3d Cir.1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); *Bennett v. Berg*, 685 F.2d at 1062; *Moss v. Morgan Stanley Inc.*, 719 F.2d 5 (2d Cir.1983). Therefore, application of the RICO provisions is not barred by plaintiff's failure to allege and prove defendant's ties to organized crime.

Having thus determined that plaintiff has properly alleged and proven the requisite statutory elements necessary to prevail in its civil RICO claims, a final issue must be addressed—that being whether Congress intended RICO to envelop common-law business fraud permitting a successful plaintiff to obtain treble damages. The Supreme Court noted in *Turkette* that Congress was well aware in enacting RICO that it would "mov[e] large substantive areas formerly totally within the police power of the State into the Federal realm." 452 U.S. at 586, 101 S.Ct. at 2530. The Court further stated that Congress acted within its power in including state-law crimes within the definition of racketeering. *Id.* at 587, 101 S.Ct. at 2530. RICO expressly includes mail and wire fraud within this definition. 18 U.S.C. § 1961(1)(B).

 If Congress wished to narrow the scope of RICO it could have done so, but this court may not arrogate to itself the functions of the legislature. Accordingly, I find that the statutory elements entitling plaintiff to relief under the civil damage provisions of RICO have been met. For the foregoing reasons, I find that defendant, Enright Refining Company, Inc., is liable to plaintiff in the amount of $333,-527.52, plus interest and costs of this suit, including reasonable attorney's fees. Plaintiff will submit an order for entry of judgment.