**Richard KAUFMAN and Cove Capital Corp., Plaintiffs,**

v.

**The CHASE MANHATTAN BANK, N.A., Defendant.**

**No. 82 Civ. 7592 (RWS).**

United States District Court, S.D. New York.

Feb. 15, 1984.

Casey, Haythe & Krugman, New York City by James M. Shaughnessy, New York City, of counsel, for plaintiffs.

Milbank, Tweed, Hadley & McCloy, New York City by William H. Roth, New York City, of counsel, Andrew S. O'Connor, New York City by Anne Golden, New York City, of counsel, for defendant.

## OPINION

SWEET, District Judge.

Defendant Chase Manhattan Bank, N.A. ("Chase") has moved pursuant to Rules 12(b)(6) and 56 of the Fed.R.Civ.P. to dismiss various claims of plaintiffs Richard Kaufman ("Kaufman") and Cove Capital Corp. ("Cove") for failure to state a claim upon which relief can be granted or alternatively to grant partial summary judgment. Kaufman and Cove have moved pursuant to Rule 15(a) of the Fed.R.Civ.P. for leave to file a second amended complaint. Kaufman's motion for leave to amend will be granted. For the facts and conclusions set forth below, Chase's motion will be granted in part and denied in part.

## FACTS

The facts as set forth by the plaintiffs will be accepted as true for purposes of the Chase motion for partial summary judgment. In the fall of 1979, Kaufman was offered an opportunity to invest in Aero Ground Support Equipment, Inc. ("Aero"), a New York corporation which was primarily in the business of supplying ground support equipment to airlines. All outstanding Aero stock was owned by Charles Bertelle ("Bertelle") and by A.B.C. Material Handling Corp. ("ABC"), a corporation wholly owned by Bertelle.

During his investigation of Aero as a potential investment, Kaufman learned that Aero was a cross-corporate guarantor of a $550,000 loan to ABC, made by Chase and obtained through the United States Small Business Administration ("SBA") who co-guaranteed 90% of the loan. To secure performance of the guaranty, Chase held a security interest in Aero's assets. In his preliminary discussions with the principals of Aero, Kaufman stated that he

would not invest in their company without a release from Chase of both its security interest in Aero's assets and Aero's cross-corporate guaranty ("guaranty") of ABC's indebtedness to Chase.

On November 9, 1979, Kaufman attended a meeting at Chase with two bank officers, James Magee ("Magee") and John Nolan ("Nolan"), where Kaufman reiterated that he would not invest in Aero unless Chase agreed in writing to release Aero from both the guaranty and the security interest. Magee and Nolan orally assured Kaufman that Chase would do so and that they would seek the SBA's approval as well.

In a letter signed by Michael P. Maher ("Maher") dated November 19, 1979, Chase asked the SBA to approve the bank's release of Aero's guaranty. Kaufman was sent a copy of that correspondence. The SBA agreed to the release of Aero's guaranty on the following conditions: (a) that Bertelle and his son-in-law, Eugene Sackman ("Sackman"), who was an officer of ABC, deliver second mortgages on their homes as substitute security for the $550,000 loan, (b) that ABC pay its back tax liability and all future taxes and (c) that Kaufman invest a minimum of $450,000 in Aero. Bertelle and Sackman agreed to the conditions set forth by Chase and the SBA in a letter to Nolan dated December 20, 1979. On December 21, 1979, Maher wrote to Bertelle on behalf of Chase agreeing to release Aero as guarantor "as per agreement between Chase Manhattan Bank, ABC Material Handling Corp. and the Small Business Administration." The letter went on to state that Chase was in the process of filing a UCC–3 Termination Agreement releasing their security interest in the assets of Aero, which was, in fact, filed with Kings County on December 28, 1979 and with New York State on January 23, 1980. Bertelle forwarded a copy of the Maher letter to Kaufman's attorney, who subsequently gave it to Kaufman.

At roughly the same time, Chase agreed, by letter dated December 19, 1979, to terminate its factoring relationship with Aero and to release its security interest in Aero's assets which Chase had obtained in July 1979 pursuant to the factoring arrangement. Chase failed to file UCC–3 termination statements, however, with respect to that security interest.

Kaufman invested a total of $330,000 in Aero receiving a series of four notes including a convertible debenture, dated January 15, January 22, February 7 and March 26, 1980. Pursuant to these investments, Kaufman and Aero signed a Purchase Agreement ("Agreement") dated January 1, 1980, which set forth the following specific condition:

> [Aero] shall have obtained from [Chase] and the United States Small Business Administration a release of all the properties and assets of the Company from the lien of a note dated on or about August 15, 1979 in the principal amount of $550,000 made by (ABC), Metropolitan Lift Parts, Inc., Metropolitan Lift Parts of New Jersey, Inc., and [Aero] to [Chase] and shall provide the Purchaser and his counsel with evidence of such release in form satisfactory to the Purchaser and his counsel. (Plaintiff's Exhibit G, p. 12.)

Kaufman accepted the December 21 Maher letter as proof of the release.

In June 1980, Kaufman exchanged the initial $100,000 convertible debenture for 51% of Aero's stock. Shortly thereafter Kaufman, Bertelle and a third party formed Cove as a holding company for all but an insignificant fraction of shares in Aero stock, all of ABC's stock, and all but 10% of the stock in Metropolitan Lift Parts, Inc., a New York corporation also previously owned by Bertelle.

Beginning in March 1980 and periodically thereafter, Kaufman obtained a series of commercial loans from Chase to meet Aero's short-term cash flow needs. On each occasion, Chase required Kaufman's personal guaranty of repayment prior to making the loans to Aero. By written instruments dated March 27, 1980, May 18, 1981 and June 25, 1981, Kaufman personally guaranteed repayment of Aero's past

and future indebtedness to Chase. In addition, on March 17, 1981, Chase agreed to convert the $101,000 outstanding balance which ABC owed to Chase pursuant to a factoring agreement—which predated Kaufman's involvement with ABC—into a new three-year term loan (the "new loan"), again with Kaufman's personal guaranty and additionally, with Cove's corporate guaranty.

Despite Kaufman investments and Chase's loans, Aero was not able to operate profitably. After an unsuccessful attempt to sell Aero and believing its assets sufficient to pay off the Chase loans he had guaranteed, Kaufman decided to liquidate Aero in December, 1981. At that time, it was agreed that Chase would apply the proceeds of the liquidation of Aero against the outstanding balance on the short-term loans owed to Chase. Kaufman spent $21,-198.50 of his personal funds to assist Chase in marshalling Aero's assets. In late February 1982 after the liquidation of Aero's assets, Chase advised Kaufman, presumably for the first time, of the conditions precedent to Aero's release from both the guaranty and the security interest and the fact that the conditions had not been fulfilled. After conferring with the SBA, however, Chase agreed that, if Bertelle and Sackman then gave Chase second mortgages on their homes, Chase would still release the guaranty and security interest in Aero. When Bertelle and Sackman refused, Chase applied the $260,000 proceeds from the sale of Aero's assets toward the indebtedness of ABC and demanded that Kaufman honor his guaranty of Chase's loans to Aero which totalled $365,000 plus interest.

In August 1982, ABC defaulted on the $550,000 loan. The SBA honored its 90% guarantee of the loan—paying Chase $355,-838.50—and then liquidated ABC. Chase demanded that Kaufman and Cove honor their guarantees of ABC's new loan in the amount of $101,000 plus interest.

Kaufman and Cove seek compensatory and punitive damages as a result of the loss of Kaufman's investment in Aero and seek declaratory relief to void Kaufman's obligations arising from his personal guaranties to repay the loans advanced to Aero and to void Kaufman and Cove's guaranties of ABC's indebtedness. The complaint contains twenty-one causes of action based upon common law fraud, misrepresentation and negligent misrepresentation, breach of contract and violation of Section 10b of the Securities Exchange Act of 1934 and Rule 10b–5, various provisions of the New York State securities laws, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Kaufman and Cove allege that Chase's self-interest was the motivating force from the beginning in a scheme to fraudulently induce Kaufman's investment in Aero, which at the time was a severe financial drain on ABC endangering not only the SBA loan, but also the factoring arrangement between ABC and Chase. Chase, in their view, continued the deception relating to the release of Aero's guaranty and security interest for over two years while drawing Kaufman and subsequently, Cove, deeper and deeper into additional guaranties of Aero and ABC's indebtedness, all to Chase's benefit.

Chase in its answer raises counterclaims against Kaufman and Cove seeking judgment in the amount of this guarantee of Aero and ABC's indebtedness to Chase.

*The Pleadings*

In counts I, II, III, IV, V, and VI the plaintiffs seek recovery of monies invested in Aero which were lost when the company's assets were liquidated. These claims, based upon the Securities Act of 1934 (first claim), state securities laws (second and third claims), common law fraud (fourth claim), common law negligent misrepresentation (fifth claim) and breach of contract (sixth claim), are premised upon plaintiffs' contention that the loss of their investment was caused by the misstatements and omissions in the Maher letter of December, 1979, and Chase's subsequent omission by failing to notify the plaintiffs until February, 1982, that the guaranty in fact had not been released. The plaintiffs maintain that had they known the guaranty was still in effect, they would not have made the in-

**354**

vestments in Aero nor would they have given personal and corporate guaranties in connection with subsequent Chase loans to Aero and to ABC. Chase concedes that plaintiffs' claims arising from the alleged misappropriation of the proceeds from the liquidation of Aero's assets remain at issue.

*Causation*

■ Chase has moved to dismiss counts I, IV, V and VI on the ground that the alleged misrepresentations concerning the release of the guaranty and security interest were not the proximate cause of plaintiffs' loss of their investment, since the continued effectiveness of the guaranty was in no way related to the decline in value of Aero's stock or to Kaufman's subsequent inability to find a buyer for the failing company. According to Chase, the loss was caused by the recession in the airline industry, poor management and other intervening business factors. Such an analysis distinguishes "transaction causation"—that which caused plaintiff to engage in the transaction in question—from "loss causation"—that which caused the economic loss. *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974) (proof of causation in fraud-related cases requires satisfaction of both distinct elements), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Chase further points out that at the time Kaufman made the decision to sell and then to liquidate when no buyer could be found, Kaufman was operating under the mistaken belief that the guaranty and security interest had been released. This fact proves, Chase argues, that absolutely no causal link exists between the misrepresentation and the reason for loss. That particular sword, however, cuts both ways since Kaufman once again entered into transactions with false information.

Both plaintiffs and Chase rely upon *Marbury Management v. Kohn,* 629 F.2d 705 (2d Cir.1980), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469. In *Marbury Management,* a brokerage trainee knowingly misrepresented to his employer's customers that he was an experienced and licensed broker. After a non-jury trial the Honorable Lee P. Gagliardi held the defendant, but not the brokerage firm who employed him, liable under § 10(b) of the Securities Exchange Act and awarded damages on the theory that the fraudulent representation not only induced the initial transaction, but resulted in the continued retention of the securities on the faith of plaintiffs' belief in the initial assertions. Reversing the district court's holding on the brokerage firm's non-liability, the Second Circuit affirmed Judge Gagliardi's factual determination with regard to the legal cause of the plaintiff's investment loss. In a footnote, the majority reiterated that, despite Judge Meskill's dissent to the contrary, their holding in *Marbury Management* did not represent a departure from basic principles of proximate causation. Emphasizing that damages may flow from inaction, as well as action, the Court concluded:

> ... in all fraud cases, the element of proximate cause is more impalpable than in negligence cases because we are dealing with the plaintiff's state of mind. The defendants cannot, therefore, require the same exact proof of causation.

*Marbury Management, supra,* 629 F.2d at 709, quoting *Continental Insurance Co. v. Mercadante,* 222 App.Div. 181, 225 N.Y.S. 488, 494 (1st Dept.1927).

I conclude that under the pre-*Marbury Management* standard of causation Chase's representation could not have been the legal cause of Kaufman's subsequent investment loss. However, the Court in *Marbury Management* held, as I see it, that where the alleged misrepresentations could be found to have induced both the purchase and the retention of the investment, proximate cause has been established. As a result, defendant's motion for partial summary judgment dismissing counts I, IV, V and VI will be denied.

■ Counts II, III, VIII, and IX allege violations of New York General Business Law §§ 339–a and 352–c (part of the so-called "Martin Act"). Chase has moved to dismiss these claims maintaining that un-

der the provisions of the state securities law the party making the alleged misrepresentations or engaging in deceptive practices must be either the seller or purchaser of the securities.[1]

The intention of the Martin Act was to protect the general public against fraud in the sale of securities and "cannot be reasonably extended to cover a purchaser who does not make his purchase from the misrepresenter ..." *Herdegen v. Paine, Webber, Jackson & Curtis*, 31 Misc.2d 104, 220 N.Y.S.2d 459 (Sup.Ct.N.Y.Co.1961). Similarly in *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937 (S.D.N.Y.1979), the Honorable Constance Baker Motley dismissed a claim under Section 352–c, on the basis of *Herdegen*, where

the plaintiff did not purchase or sell securities from defendants as a result of the alleged misrepresentations, nor were the alleged misrepresentations designed to induce or promote such a purchase or sale.

*Schenck, supra*, 484 F.Supp. at 946.

Despite the plaintiffs' attempts to distinguish *Herdegen* and *Schenck* and to make policy arguments for bringing the New York law into conformity with federal securities regulations—some of which cast a much broader liability net—no authority under New York law to do so has been offered. As a result, counts II, III, VIII, and IX will be dismissed from the complaint.

## Equitable Relief

In counts XI, XVI and XVIII the plaintiffs seek equitable relief from their indebtedness to Chase, as a result of Chase's negligent misrepresentation. Relying on the requirement that a "special relationship" or "relation of duty" must exist before liability can be imposed for the tort of negligent misrepresentation, Chase characterizes its relationship with the plaintiffs as that of "legal strangers" who may have had one meeting and several telephone conversations concerning an investment in a third party. Such an argument is not persuasive since it overlooks, *inter alia*, the fact that Chase as the holder of the $550,000 note to ABC, was not a disinterested party in Kaufman's proposed investment in Aero—whose startup was perceived by Chase to have "created a serious cash drain" on ABC (Maher's Dep. Exhibit 33). Thus, the question of Chase's relationship to Kaufman at the time of the alleged misrepresentation remains an issue for the trier of fact, and Chase's motion to dismiss

---

1. Section 339–a provides that:

Any person, who, with intent to deceive, makes, issues or publishes, or causes to be made, issued or published, any statement or advertisement as to the value or as to facts affecting the value of the stocks, bonds or other evidences of debt of a corporation, company or association, or as to the financial condition or facts affecting the financial condition of any corporation, company or association which has issued, is issuing or is about to issue stocks, bonds or other evidences of debt, and who knows, or has reasonable ground to believe that any material representation, prediction, or promise made in such statement or advertisement is false, is guilty of a misdemeanor.

N.Y.Bus.Law (McKinney 1968).

Section 352–c provides, *inter alia*, that:

1. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices: (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale; (b)

Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances; (c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities, as defined in section three hundred fifty-two of this article, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

2. It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to engage in any artifice, agreement, device or scheme to obtain money, profit or property by any of the means prohibited by this section.

N.Y.Bus.Law (McKinney 1968).

the claims relating to negligent misrepresentation will be denied.

*Punitive Damages*

■ The plaintiffs also seek punitive and exemplary damages for Chase's allegedly malicious, willful and wantonly fraudulent conduct. In New York punitive damages may be awarded in actions for fraud only where the fraud is "aimed at the public generally," evincing a "high degree of moral turpitude," and demonstrating "such wanton dishonesty as to imply a criminal indifference to civil obligations." *Durham Industries, Inc. v. North River Insurance Company*, 673 F.2d 37, 41 (2d Cir.1982), *cert. denied*, 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1983), citing *Walker v. Sheldon*, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497 (Ct.App.1961). *See also Lovebright Diamond Company Inc. v. Spragins*, 574 F.Supp. 76, 80 (S.D.N.Y.1983) (breach of contract and fiduciary duty for sole purpose of defendant's own financial gain is not wanton behavior or conduct evidencing a criminal disregard for civil liability); *Zaretsky v. E.F. Hutton & Co., Inc.*, 509 F.Supp. 68, 77 (S.D.N.Y.1981) (mere allegations of fraud do not give rise to a cause of action for punitive damages; nor are punitive damages available for mere breach of contract); *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (Ct.App.1976); *Marcus v. Marcus*, 92 A.D.2d 887, 459 N.Y.S.2d 873, 874 (2d Dep't 1983).

The fraud alleged under the facts of this action are similar to those alleged in *Richardson v. Shearson/American Express Co., Inc.*, 573 F.Supp. 133 (S.D.N.Y.1983), where the plaintiffs sought, *inter alia*, punitive damages from two major investment firms for alleged fraudulent misrepresentations and omissions of material facts which induced plaintiffs to purchase, and in some cases retain, stocks of a particular company for purposes of manipulating the price. In dismissing the claims for punitive damages, the Honorable Henry Werker noted that despite the use of words such as "wilful" and "wanton" in the complaint, the claims "do not allege conduct that rises to the level of that required for the imposition of punitive damages." *Id.* at 136.

■ Here there is no claim that Chase's allegedly fraudulent conduct in connection with the Kaufman investment was part of a larger scheme aimed at the investing public in general. Furthermore, even assuming Chase anticipated ABC's subsequent default on the SBA loan and therefore saw itself as the ultimate beneficiary of Kaufman's investment, the alleged misrepresentation with regard to the release by Chase of Aero's guaranty and security interest does not constitute fraud evincing a "high degree of moral turpitude" nor does it demonstrate "such wanton dishonesty as to imply a criminal indifference to civil obligations." As a result, Kaufman and Cove's demands for punitive damages will be dismissed from the complaint.

*RICO*

In count XXI of the complaint, the plaintiffs repeat the now-familiar litany in securities fraud cases of a RICO violation under 18 U.S.C. §§ 1962(a) and 1962(c), and seek treble damages pursuant to Section 1964(c), as well as equitable relief enjoining Chase from enforcing Kaufman's personal guarantee and Cove's corporate guaranty of Aero's and ABC's indebtedness to Chase. Although fewer than 50 civil RICO cases were filed in the first decade after the Act's passage, in the past few years there has been an explosion of such suits, with an accompanying proliferation of scholarly comment.[2] The vast majority of these cases involved garden variety fraud claims

---

2. The most recent article in what has become almost weekly submissions on the subject of civil RICO in that journal alone is by Skinner and Tone, *Civil RICO and the Corporate Defendant*, Natl.L.J., January 30, 1984, at 22, col. 1. See also the remarks of the Honorable Milton Pollack of the Southern District Court at a "Symposium Highlighting Developments in Securities Law Over the Past Century" as reported in the 95th Anniversary Special Issue, N.Y.L.J., January 30, 1984, at 52, col. 2.

against defendants who had not been subjected to any prior criminal charges.

Enacted as part of the Organized Crime Control Act of 1970, the statute includes a private right of action for treble damages to anyone injured "by reason of" a violation of the substantive 1962 section. The Court of Appeals in this Circuit has set forth the two pleading burdens imposed upon a plaintiff seeking to state a claim for damages under civil RICO. *See Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983). The plaintiffs must first allege adequately that defendant has violated the substantive RICO statute, 18 U.S.C. § 1962, commonly known as "criminal RICO," before turning to the second burden of alleging that he was injured in his business or property *"by reason of* a violation of section 1962." *Id.* The complaint in this action is defective at both levels of inquiry.

Although the standard of proof differs, the essential elements of a substantive § 1962 RICO offense are the same in both criminal and civil RICO actions. The applicable language for the alleged violation in the instant case prohibits any "person (including a corporation) employed by or associated with any interstate "enterprise," from using the proceeds of any income derived, directly or indirectly, from a pattern of racketeering activity, in the operation of the enterprise, 18 U.S.C. § 1962(a), or from conducting the affairs of that enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). "Enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4). A "pattern of racketeering activity" is defined as the commission of two or more specific criminal acts within a ten-year period, including mail and wire fraud and fraud in the sale of securities. 18 U.S.C. § 1961(5).

Turning to the facts of this action, plaintiffs allege that Chase is both the "person" as defined by 18 U.S.C. § 1961(3) and the "enterprise" as defined by 18 U.S.C.

§ 1961(4) whose "false fraudulent and untrue statements"—both in the December 21 Maher letter and in numerous oral communications—constitute indictable offenses under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud), and as such represent the predicate acts necessary for the establishment of a "pattern of racketeering activity," 18 U.S.C. § 1961(5).

All that is required under the broad federal mail fraud statute is an allegation of a scheme designed to defraud or obtain money by false pretenses and the use of the mails in the furtherance of that scheme. Since each mailing has been held to constitute a predicate act for purposes of establishing the "pattern of racketeering activity," *United States v. Weatherspoon*, 581 F.2d 595, 601 (7th Cir.1978), the plaintiffs have adequately alleged the necessary predicate acts. *See also United States v. Chovanec*, 467 F.Supp. 41, 44 (S.D.N.Y. 1979) (when only one scheme is alleged, the same victim can provide link between predicate acts for purposes of establishing a "pattern of racketeering activity").

■ However, the complaint fails to distinguish the "enterprise", as the vehicle for the pattern of racketeering activity, from the culpable "person," whose conduct RICO proscribes. *See Bennett v. Berg*, 685 F.2d 1053, 1061 (8th Cir.1982) (dismissing a RICO claim where the enterprise was not distinct from the culpable person), *cert. denied*, —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190–91 (4th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (affirming dismissal, with prejudice, of RICO counts where defendant corporation was indistinguishable from enterprise); *Barker v. Underwriters at Lloyd's, London*, 564 F.Supp. 352, 357 (E.D.Mich.1983) (plaintiffs must allege an enterprise distinct from the defendants in order to state a claim for a violation of section 1962(c)); *Van Schaick v. Church of Scientology of Cal., Inc.*, 535 F.Supp. 1125, 1136 (D.Mass.1982) (Rico envisions a relationship between a "person"

and an "enterprise" as an element of the offense which 1962(c) proscribes and for which 1964(c) would subject the "person" to treble damages); *Bays v. Hunter Savings Assn.*, 539 F.Supp. 1020, 1023–24 (S.D. Ohio 1982) ("the language of § 1962 clearly contemplates the interaction of a person and an enterprise, both separately defined by the Act"). *But cf. United States v. Hartley*, 678 F.2d 961, 990 (11th Cir.1982) (a corporate defendant can be simultaneously named as the "enterprise"), *cert. denied*, —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *Hirsch v. Enright*, 577 F.Supp. 339 (D.N.J. Nov. 17, 1983) (no requirement of separate identity between the "enterprise" and the "person"); *Kaushal v. State Bank of India*, 556 F.Supp. 576, 580 (N.D.Ill.1983) (it is conceptually possible for defendant corporation to shift chameleon-like from "person" to "enterprise"). As a result, the plaintiffs have failed to meet the threshold burden of pleading a substantive § 1962 violation of RICO.

The complaint also fails to allege an injury "by reason of" such a violation. Although there is division among the Circuits on what constitutes such an injury, a growing number of courts, including this one, have required something more than direct injury from the predicate acts, or a "racketeering enterprise injury," as the only meaningful limitation which can be imposed on the private treble damage provision. In *Harper v. New Japan Securities International, Inc.*, 545 F.Supp. 1002 (C.D.Cal. 1982), the California district court noted that:

> Only if this causal connection [between the alleged injury and the kind of injury RICO was intended to prevent] exists will the policies and purposes of RICO be served by permitting a private right of action. This construction while avoiding

the imposition of the antitrust requirement of "competitive injury," recognizes the similarities between the RICO treble damages provision and § 4 of the Clayton Act. In light of Congress' failure to provide any direction in determining the rules of standing appropriate to the RICO treble damage provision, the antitrust analogy is the construction of the statute which is most likely to reflect Congress' understanding of the words "by reason of."

*Id.* at 1008.[3] *E.g., Hudson v. LaRouche*, 579 F.Supp. 623, at 630, (S.D.N.Y.1983); *Gitterman v. Vitoulis*, 579 F.Supp. 423, at 427 (S.D.N.Y.1983); *Richardson v. Shearson/American Express, supra*, 573 F.Supp. at 136; *Waste Recovery Corp. v. Mahler*, 566 F.Supp. 1466 (S.D.N.Y.1983); *Bankers Trust v. Feldesman*, 566 F.Supp. 1235 (S.D.N.Y.1983); *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.*, 527 F.Supp. 206, 208 (E.D.Mich.1981). *See also Moss, supra*, 719 F.2d at 20 n. 16, where the Second Circuit did not reach the question of what type of injury is required by Section 1964(c) because plaintiff failed to establish the requisite predicate acts, but where the Court italicized the words "by reason of" for emphasis. *But cf. Schacht v. Brown*, 711 F.2d 1343, 1358 (7th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *Mauriber v. Shearson/American Express*, 567 F.Supp. 1231, 1240 (S.D.N.Y.1983). In the instant case, the plaintiffs have alleged no facts to support injury "by reason of" anything more than that resulting from the alleged predicate acts themselves.

Plaintiffs also seek injunctive relief under the RICO statute against the enforcement by Chase of Kaufman's guaranty of Aero's indebtedness and Kaufman and

---

**3.** The National Law Journal recently reported what was believed to be the first successful judgment in a civil RICO case. *Hirsch v. Enright*, 577 F.Supp. 339 (D.N.J.1983). Although there was no discussion in the *Hirsch* opinion of the "injury by reason of" requirement, under the facts of the case, Hirsch's injuries resulting from En-

right's fraudulent billing practices, would seem to be a "racketeering enterprise injury" and to satisfy the requirement of a causal connection between the alleged injury and the policies and purposes of RICO, i.e. preventing the infiltration of organized crime's financial resources into the stream of legitimate business.

Cove's personal and corporate guaranty of ABC's indebtedness to the bank. The question of whether equitable remedies are even available to private parties under § 1964 is yet another RICO issue over which the Circuits split. *See Bennett v. Berg, supra,* 685 F.2d at 1064 (the question of equitable remedies in private RICO action raised but not reached); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir. 1983) (availability of injunctive relief probably not available to the private RICO plaintiff); *Kaushal, supra,* 556 F.Supp. at 584 (private equitable relief not available under RICO). *But cf. Aetna Casualty & Surety Co. v. Liebowitz,* No. 81 Civ. 2616 (E.D. N.Y. Dec. 8, 1981) (availability of preliminary injunctive relief for private RICO plaintiff not contested); *Vietnamese Fishermen's Association v. Knights of the Ku Klux Klan,* 518 F.Supp. 993, 1014 (S.D.Tex. 1981) (assumed private injunctive relief under RICO but dismissed claim for failure to show a substantial likelihood of success on the merits of a RICO cause of action); *United States v. Barber,* 476 F.Supp. 182, 189 (S.D.W.Va.1979) (dictum that equitable remedies are available to private parties); *United States v. Mandel,* 415 F.Supp. 997, 1021 (D.Md.1976) (dictum that equitable remedies are available to private parties).

Since plaintiffs have failed to allege a substantive 1962 violation, it is unnecessary to reach this question. However, the Second Circuit, recently joined those courts which have expressed doubts as to the propriety of private party injunctive relief, "especially in a case ... alleging at most, garden-variety securities law violations as predicates for the RICO violation." *Trane Co. v. O'Connor Securities,* 718 F.2d 26, 28–29 (2d Cir.1983).

For the reasons stated above, defendant's motion to dismiss counts I, IV, V, VI, XI, XVI and XVIII will be denied. Defendant's motion to dismiss counts II, III, VIII, IX, and XXI, and so much of counts IV, X and XV as seek punitive damages and attorneys' fees, will be granted.

IT IS SO ORDERED.